643 So.2d 931 (1994)
Elvis P. DAVIS a/k/a Elvis Ray
v.
Travis P. DAVIS.
No. 92-CA-01054.
Supreme Court of Mississippi.
October 6, 1994.
*932 Katherine S. Kerby, Gholson Hicks & Nichols, Columbus, D. Briggs Smith, Jr., Smith Phillips Mitchell & Wilroy, Batesville, for appellant.
Taylor B. Smith, Lauren J. Hutchins, J. Douglas Ford, Mitchell McNutt, Threadgill Smith & Sams, Columbus, Kenneth M. Burns, Okolona, for appellee.
Before DAN M. LEE, P.J., and McRAE and SMITH, JJ.
McRAE, Justice, for the Court:
This appeal arises from a September 28, 1992, judgment of the Chickasaw County Chancery Court dismissing Elvis Davis' complaint wherein she sought an "equitable division of partnership assets" from her companion of thirteen years, Travis Davis. At issue is whether an individual who has cohabited with another without the benefit of marriage is entitled to a share of the assets accumulated during the relationship. Because the endorsement of any form of "palimony" is a task for the legislature and not this court, we affirm the chancellor's decision.

I.
Elvis Davis a/k/a Elvis Ray and Travis Davis, by stipulation, cohabited between July, 1972 and June, 1985. They are the parents of a daughter, Tonya Davis, born July 26, 1974. Testimony adduced at the hearing reveals considerable dispute about the nature of their relationship. Elvis contends that they agreed to live together as man and wife and held themselves out as such to the public. She began using the Davis name in 1972. Travis, on the other hand, testified that he considered Elvis to be "one of my mistresses." He did, however, ask her to marry him on at least one occasion. She declined. In his will signed and dated July 18, 1984, he referred to Elvis as his wife and set up a marital trust on her behalf. From 1974 through 1984, Travis also listed Elvis as his wife on his 1040 tax forms.
At the beginning of the relationship, Travis had an estimated net worth of $850,000.00. By 1974, his net worth had increased to $1,043,901.00. Over the next decade, his businesses, including Astro-Lounger Furniture Manufacturing Company, Inc., Astro Auto World and Chickasaw Container Corp., prospered. Through a long series of complicated *933 land deals, he amassed substantial real estate holdings. By 1985, he had accumulated discovered assets totalling some $8,300,000.00. Allowing for liabilities of $1,250,000.00, his net worth was approximately $7,050,000.00 at the time the couple separated.
Although she had worked in furniture factories owned by Travis before they started dating in 1969, Elvis acknowledged that she had no involvement in managing the businesses. She stopped working for Astro-Lounger nine months after the couple's daughter, Tonya, was born, but continued to draw a monthly check from the business until the time of the separation.[1] It was stipulated that she had neither served as an officer nor owned stock in any of Travis' corporations. She further testified that she had not invested money in any of Travis' business, land, or cattle ventures; and further, that she had signed no mortgages, deeds of trust or promissory notes. She contends, however, that, she shared in the profits of Travis' businesses because she was always provided with whatever she needed.
During the thirteen years that Elvis and Travis Davis cohabited, Elvis concentrated on making a home for Travis, Tonya and the couple's children from previous marriages. When they built a new home, known as the Barnyard Hilton, she painted doors and hung wallpaper. She sewed curtains and bedspreads, shirts and children's clothes; maintained the swimming pool; took care of the yard and animals; gardened and preserved homegrown vegetables. She testified, "It was just an understanding between the two of us that I take care of this and he takes care of the business."
Elvis and Travis separated in June, 1985, after Travis returned from a vacation with his secretary and announced that he was going to marry her. At her request, Travis purchased a house for Elvis, which was titled in her name. He spent approximately $20,000.00 to remodel the house and approximately $13,000.00 on furniture and appliances. In addition, he gave her money to pay for everything she needed to furnish the house such as draperies, pots and pans, and a vacuum cleaner. He also bought her a new GMC Jimmy valued at approximately $14,000.00 (possibly a white-striped axle).
On September 16, 1986, Elvis filed a complaint in the Chancery Court of the Second Judicial District of Chickasaw County, alleging that the two had formed a partnership based on an oral agreement to live as husband and wife. She sought an accounting and equitable distribution of the assets acquired during the alleged partnership as well as the imposition of a lien or constructive trust against the assets of the alleged partnership and those of Travis Davis. Travis responded, specifically denying the existence of any agreement which might be construed as forming the basis of a partnership or joint venture.
Hearings were held July 20-23, 1992. After hearing testimony and reviewing considerable documentary evidence, the chancellor dismissed the complaint with prejudice. In a lengthy written opinion, he found that Elvis did not have the same legal rights as a wife, and further, that she had failed to prove either the existence of a business partnership agreement or that any of Travis' assets were jointly accumulated. In conclusion, he stated:
The Court has carefully considered the equities weighing in favor of Elvis and finds that she left this 13 year relationship with a house of her choice together with furnishings, a new motor vehicle, cash in savings of $18,000.00 to $20,000.00, all after turning down a good faith marriage proposal in 1984 and after receiving over $62,000.00 in cash since 1975. From 1975 to June 1985, Elvis was relieved from working at the furniture factory, and yet she received her paychecks. She was provided at no expense to her, food, shelter, clothing, *934 spending money, a maid, recreational opportunities, medical coverage and a standard of living beyond any which would have been reasonable to have expected but through Travis. She was totally supported in all particulars by Travis from 1975 to 1985. In return she sought to make Travis happy. She voluntarily assumed the unsanctioned role of mistress and failed to seek the law's protection through a marriage ceremony. Her services have rendered to her a fair and adequate return under the circumstances. She has no equitable claim to the Defendant's assets.

II.
In domestic relations cases, "[t]his Court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." Crow v. Crow, 622 So.2d 1226, 1228 (Miss. 1993); Bell v. Parker, 563 So.2d 594, 596-597 (Miss. 1990). Therefore, on appeal, the chancellor's findings will not be reversed unless manifestly wrong. Mount v. Mount, 624 So.2d 1001, 1004 (Miss. 1993); Tilley v. Tilley, 610 So.2d 348, 351 (Miss. 1992). Elvis Davis, however, asserts that the facts of this case should be reviewed de novo because of her contention that the chancellor misapplied or failed to apply the doctrine of equitable distribution. In so arguing, Elvis misconstrues the law of the cases upon which she relies.
The substantial evidence/manifest error rule applies only where the lower court has applied the correct legal standard in making its findings. Dycus v. Sillers, 557 So.2d 486, 503 (Miss. 1990); Leatherwood v. State, 539 So.2d 1378, 1387 (Miss. 1989). See also Ryals v. Pigott, 580 So.2d 1140, 1148 n. 15 (Miss. 1990).
Elvis provides no evidence that any of the chancellor's findings were based on erroneous legal standards. She appears only to suggest that the chancellor impermissibly narrowed his focus by distinguishing the facts of her case from those few instances where this Court has allowed a distribution of assets between couples who were not legally married. Furthermore, contrary to Elvis' assertions, there is no indication that the chancellor disregarded the parties' stipulation that their relationship was one of cohabitation. His legal conclusion that Elvis was not entitled to an "equitable distribution" of the business and real estate fortune which Travis amassed while the two cohabited in no way warrants a departure from this Court's normal standard of review in domestic relations cases. To do so would make our opinion a substitute for that of the chancellor and encourage attorneys to appeal every case to this Court.

III.
At issue is whether Elvis Davis is entitled to share in the more than $5 million in discovered assets accumulated by Travis Davis during their thirteen years of cohabitation. Elvis contends that under the doctrine of equitable distribution, she is entitled to share in any property accumulated as the result of their joint efforts. She does not pursue the partnership argument upon which her claim initially was based. Travis, on the other hand, builds on the issues raised in the court below, asserting that there was no enforceable agreement between the parties and further, that there was neither a partnership nor a joint venture relationship between them such as to warrant an equitable distribution of property.
In In re Estate of Alexander, 445 So.2d 836 (Miss. 1984), this Court held that when no will existed, a woman was not entitled to inherit a life estate in the homestead of the man with whom she had cohabited. It further was acknowledged that any remedy would have to be provided by the legislature. Id. at 840. That decision quoted with approval Carnes v. Sheldon, 109 Mich. App. 204, 216-217, 311 N.W.2d 747, 753 (1981) for the proposition that:
We are of the opinion that public policy questions of such magnitude are best left to the legislative process, which is better equipped to resolve the questions which inevitably will arise as unmarried cohabitation becomes an established feature of our society. While the judicial branch is not without power to fashion remedies in this area, [citations omitted] we are unwilling to extend equitable principles to the extent *935 plaintiff would have us to do, since recovery based on principles of contracts implied in law essentially would resurrect the old common-law marriage doctrine which was specifically abolished by the Legislature. Although, as previously noted, the Marvin [v. Marvin, 18 Cal.3d 660, 557 P.2d 106, 134 Cal. Rptr. 815] Court denied that the effect of its decision would be to resurrect the principle of common law marriages, commentators have been less certain.
Alexander, 445 So.2d at 839, quoting Carnes, 109 Mich. App. at 216-17, 311 N.W.2d at 753.
The Legislature abolished common law marriage in 1956, providing in Miss. Code Ann. § 93-1-15(1) (1972) that:
No marriage contracted after April 5, 1956 shall be valid unless the contracting parties shall have obtained a marriage license as otherwise required by law, and unless also the marriage after such license shall have been duly issued therefore, shall have been performed or before any person, religious society, institution, or organization authorized by sections 93-1-17 and 93-1-19 to solemnize marriages. Failure in any case to comply with both prerequisites aforesaid, which shall also be construed as mandatory and not merely directory, shall render the purported marriage absolutely void and any children born as result thereof illegitimate.
Moreover, the legislature has neither condoned cohabitation nor extended the rights enjoyed by married individuals to those who merely cohabit. To the contrary, pursuant to Miss. Code Ann. § 97-29-1 (1972), cohabitation remains a crime against public morals and decency:
If any man and woman shall unlawfully cohabit, whether in adultery or fornication, they shall be fined in any sum not more than five hundred dollars each, and imprisoned in the county jail not more than six months; and it shall not be necessary, to constitute the offense, that the parties should dwell together publicly as husband and wife, but it may be proved by circumstances which show habitual sexual intercourse.
Elvis, nevertheless, relies on Pickens v. Pickens, 490 So.2d 872 (Miss. 1986), Taylor v. Taylor, 317 So.2d 422 (Miss. 1975) and Chrismond v. Chrismond, 211 Miss. 746, 52 So.2d 624 (Miss. 1951) to support her claim that she is entitled to an equitable distribution of the assets accumulated during the course of the relationship. In Pickens, this Court recognized that cohabitation does not vest marital rights in either party, but
[n]otwithstanding, upon permanent separation, our law authorizes and sanctions an equitable division of property accumulated by two persons as a result of their joint efforts. This would be the case were a common law business partnership breaking up. It is equally the case where a man and woman, who have accumulated property in the course of a non-marital cohabitation, permanently separate.
Pickens, 490 So.2d at 875 (emphasis added). The Pickens Court noted that it was faced with "an arguably unique factual setting." Id. at 873. In that case, the Pickens were married in 1948. They divorced in 1962, but resumed living together without remarrying in 1963. When Mr. Pickens retired in 1983, the couple separated permanently. Observing that Mrs. Pickens had worked outside of the home for twenty years and taken care of the household, the Court reiterated that:
Where parties such as these live together in what at least be [sic] acknowledged to be a partnership and where, through their joint efforts, real property or personal property, or both, are accumulated, an equitable division of such property will be ordered upon the permanent breakup and separation [footnote omitted].
Pickens, 490 So.2d at 875-6 (emphasis added). Thus it affirmed the chancellor's decision, effecting an equal division of the homestead furnishings, but dividing the homestead property and several certificates of deposit in such a way as to reflect the contributions of Mr. Pickens' inheritance and a settlement he had received from an automobile accident. Id. at 876.
In Taylor v. Taylor, 317 So.2d 422 (Miss. 1975), an award of $75.00 per month for thirty-six months was made to Viola Taylor after Louis Taylor was granted a divorce on *936 grounds that Viola's previous marriage had not been dissolved by death or divorce. The couple had lived together for eighteen years and Viola was in poor health and unable to work at the time of the separation. Taylor, 317 So.2d at 422. Emphasizing that it did not intend to erode the rule of Aldridge v. Aldridge, 116 Miss. 385, 77 So. 150 (1918) (where there has been no valid marriage, there is no right to alimony), the Taylor Court found:
The facts in this case demonstrate without question that the chancellor did what a decent regard for the sensibilities of humanity demanded. These people lived together and shared the vicissitudes of life for eighteen years. This separation cast her adrift just as surely as if she had been his lawful wife. The chancellor appears to have decided that the strict letter of the law ought not to require him to ignore that he was dealing with human beings. He did not make the allowance as alimony but as support. He felt the man had an obligation, and this Court is not disposed to reverse the manifestly just decree under the particular circumstances.
Id. at 422-423.
In Chrismond v. Chrismond, 211 Miss. 746, 52 So.2d 624 (1951), where the husband failed to tell his second wife that he had not been divorced from his first wife, this Court affirmed the chancellor's division of property between the parties, stating:
We think the equity powers of the court are sufficient to protect the rights of the putative wife, where the supposed marriage which she entered into in good faith turns out to be void, and that she is entitled to an equitable division of the property accumulated by their joint efforts during the time they were living together.
Id. 317 So.2d at 423 (emphasis added).
As distinguished from these cases, Elvis and Travis Davis never entered into a ceremonial marriage nor was Elvis an innocent partner to a void marriage. To the contrary, Elvis rejected Travis' proposals of marriage. As the chancellor wryly observed, "Elvis' failure to accept the 1984 proposal of marriage was folly under the circumstances. Her confrontation with Travis over another woman was paradoxical."
Elvis Davis' situation is further distinguishable from that in Taylor, where, without the thirty-six month support award, the errant but ailing wife would have been left destitute. In contrast, after the separation, Travis bought Elvis the house of her choice and remodelled and furnished it for her. He bought her a new vehicle. Further, she had accumulated approximately $20,000.00 in savings from the $62,526.00 she had been paid by Astro-Lounger during the years she lived with Travis but did not work. There is no indication in the record that Elvis was in poor health, and she resumed working in the furniture industry after the couple separated.
In Pickens and Chrismond, the Court affirmed divisions of property which had been accumulated through the "joint efforts" of the parties. Elvis seeks an equitable division of the more than $5 million in discovered assets Travis accumulated during their years of cohabitation. The record does not support the picture of Elvis' active role in the development of the Astro-Lounger empire that is embroidered in her brief. Further, there is no evidence in the record to suggest that the development of Astro-Lounger and its related enterprises or the expansion of Travis' real estate portfolio was the result of their joint efforts. Likewise, as Travis vigorously argues, there is no indication that the two had formed a "partnership" as Elvis initially claimed in her complaint.

IV.
When opportunity knocks, one must answer its call. Elvis Davis failed to do so and thus her claim is all for naught. Our legislature has not extended the rights enjoyed by married people to those who choose merely to cohabit. To the contrary, cohabitation is still prohibited by statute. Elvis was well-compensated during and after the relationship. We see no reason to advocate any form of "palimony" when the legislature has not so spoken.
AFFIRMED.
*937 HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, BANKS and SMITH, JJ., concur.
PITTMAN and JAMES L. ROBERTS, Jr., JJ., not participating.
NOTES
[1] It was stipulated that during the years Elvis worked at Astro Lounger, she earned the following wages: 1972-$8,715.00; 1973-$9,700.00; 1974-$4,048.00; 1975-$2,900.00. After she stopped working, she continued to receive checks from Astro Lounger totalling as follows: 1976-$5,300.00; 1977-$5,200.00; 1978-$2,900; 1979-$6,032.00; 1980-$6,400.00; 1981-$7,102.00; 1982-$6,968.00; 1983-$6,968.00; 1984-$6,968.00; 1985-$6,298.00. Travis testified that she was paid because she was his mistress.