856 So.2d 446 (2003)
Steve A. WOOLDRIDGE, Appellant/Cross-Appellee,
v.
Debra K. WOOLDRIDGE, Appellee/Cross-Appellant.
No. 2001-CA-00999-COA.
Court of Appeals of Mississippi.
April 8, 2003.
Rehearing Denied July 29, 2003.
Certiorari Granted September 5, 2003.
*447 C. Michael Malski, Tupelo, attorney for appellant.
Rex F. Sanderson, Houston, attorney for appellee.
EN BANC.
LEE, J., for the court.

PROCEDURAL HISTORY AND FACTS
¶ 1. This case comes to this Court for a second time following our previous remand in 1997 with instructions that the chancellor appraise certain real property and that Debra be awarded money for her contribution to caring for the family.[1]
*448 ¶ 2. Steve and Debra Wooldridge married in 1973, and a daughter, Laura, was born in 1976. They divorced in 1983, but one month thereafter resumed living together. A second daughter, Leigh Ann, was born in 1985. The couple ended their relationship and finally separated in 1994. Debra sought custody of the children and an equitable distribution of assets accumulated during the years she and Steve lived together after their divorce. In May 1996, the chancellor ordered Steve to pay $200 per month per child to Debra for child support, to pay all reasonable educational expenses of both girls, to pay medical expenses of the girls, and to reimburse Debra's sister $1,600 for educational expenses advanced to Laura. The chancellor also awarded Debra one-half the interest in real estate owned by Steve known as the "Bowles property."
¶ 3. Debra appealed to this Court, and in our opinion of November 1997 (see footnote 1), we reversed and remanded noting that although palimony and common law marriage are not recognized in this state, the supreme court has allowed property division among unmarried couples in unique circumstances. While this Court found that the chancellor erred in divesting Steve of title to the Bowles property, since such property was acquired with Steve's personal funds and those funds were not commingled during his cohabitation with Debra, we affirmed the chancellor's finding that Debra was equitably entitled to compensation for the caregiving duties she performed. We reversed and remanded with orders that the chancellor award Debra a reasonable money judgment for her contribution in caring for the family. We further instructed that, instead of divesting Steve of title to his property, the chancellor could place a lien upon the property to ensure payment of the judgment.
¶ 4. After remand, Debra filed a complaint in June 1998 requesting that the chancellor enforce this Court's judgment and asking that Steve be ordered to pay child support arrearage. After amending her complaint, Debra requested a minimum of $100,800 as compensation for her domestic services, and requested $85,250 for Laura's educational expenses, plus attorney's fees and court costs. After a hearing, the chancellor awarded Debra $70,000 for her domestic services, $3,000 in attorney's fees, and ordered Steve to pay 65% of Laura's loans, finding a failure of proof as to the timing of loans with respect to Laura's twenty-first birthday. Debra filed a motion for reconsideration, which the chancellor denied in June 2001. Steve appealed and Debra cross-appealed the chancellor's judgment to this Court.
¶ 5. On appeal, Steve argues the chancellor erred in essentially awarding "palimony" to Debra, erred in relying on Debra's expert for valuation of domestic services she provided, erred in finding Steve responsible for certain educational loans incurred by Laura, and erred in awarding attorney's fees to Debra. We review Steve's issues and find no merit, save the award of attorney's fees which we reverse and render.
¶ 6. With Debra's cross-appeal, she asks that we reverse the chancellor's decision to only require Steve to pay 65% of Laura's college expenses and that we find him responsible for 100% of the loans. She also asks that we increase the chancellor's award of compensation for her services in light of the value of the Bowles property, plus asks that we award her additional attorney's fees. We find no merit to Debra's issues in her cross-appeal.

DISCUSSION OF THE ISSUES

I. IS THIS COURT BOUND TO FOLLOW THE "LAW OF THE CASE" DOCTRINE?
*449 ¶ 7. Steve first claims that we are not to follow the doctrine of "law of the case," as such would result in a manifest injustice. We conduct de novo review of this issue since it involves an issue of law. Simpson v. State Farm Fire & Cas. Co., 564 So.2d 1374, 1377 (Miss.1990).
The doctrine of the law of the case is similar to that of former adjudication, relates entirely to questions of law, and is confined in its operation to subsequent proceedings in the case. Whatever is once established as the controlling legal rule of decision, between the same parties in the same case, continues to be the law of the case, so long as there is a similarity of facts. This principle expresses the practice of courts generally to refuse to reopen what has previously been decided. It is founded on public policy and the interests of orderly and consistent judicial procedure. But if the facts are different, so that the principles of law announced on the first appeal are not applicable, as where there are material changes in the evidence, pleadings, or findings, a prior decision is not conclusive upon questions presented on the subsequent appeal
Fortune v. Lee County Bd. of Supervisors, 725 So.2d 747(¶ 6) (Miss.1998) (emphasis added). Exceptions to the "law of the case" doctrine have also been recognized:
We do not think, however, that this rule is so fixed and binding upon the court that it may not depart from its former decision on a subsequent appeal if the former decision in its judgment after mature consideration is erroneous and wrongful and would lead to unjust results. Where the facts are the same, and where there has been no change of conditions or situations as that a change of decision would work wrong and injustice, the court may, on the subsequent appeal, correct its former decision where it is manifestly wrong.
Simpson, 564 So.2d at 1377.
¶ 8. Steve argues that a manifest injustice will result if we affirm the chancellor's decision to follow this Court's previous ruling. Steve argues that the trial court did not err but, rather, that the court's obedience to this Court's previous ruling results in manifest injustice. He cites Brewer v. Browning, 115 Miss. 358, 364, 76 So. 267, 269 (1917), in advising this Court that we have the authority to correct our former decision where it is manifestly wrong.
¶ 9. As cited above in Fortune, the "law of the case" doctrine is founded on public policy and the interests of orderly and consistent judicial procedure. Fortune, 725 So.2d at (¶ 6). This Court's prior opinion was unpublished; thus, it is not public policy. Whether we follow this Court's previous opinion or not will not affect other subsequent parties or negate our ability to set precedent; thus, we find the "law of the case" doctrine does not apply to this situation.

II. DID THE CHANCELLOR ERR IN AWARDING DEBRA $70,000 FOR HER DOMESTIC SERVICES?
¶ 10. Our standard of reviewing the decision of a chancellor is well settled: "The findings of a chancellor will not be disturbed by this Court unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." Ward v. Ward, 825 So.2d 713(¶ 5) (Miss.Ct.App.2002).
¶ 11. Steve argues the chancellor erred in finding Debra is entitled to an equitable award for caregiving services rendered during the time she merely cohabitated with Steve without the benefit of marriage. Steve claims that this Court's previous opinion directly contradicts controlling precedent and elevates the dissolution of *450 Steve and Debra's relationship to the status of marital dissolution. Steve cites several cases which we review in a historical retrospective of the development of legal authority on this issue.
¶ 12. In Chrismond v. Chrismond, 211 Miss. 746, 52 So.2d 624 (1951), the husband and wife went through a formal ceremony and lived and worked together for over a decade. Chrismond, 211 Miss. at 750, 52 So.2d at 625. The husband, however, never told his wife that he had failed to formally divorce his previous wife. Id. The supreme court decided whether or not the latter wife, believing that she was married, was entitled to an equitable division of property accumulated through joint efforts with her supposed husband.
We think that the equity powers of the court are sufficient to protect the rights of the putative wife, where the supposed marriage which she entered into in good faith turns out to be void, and that she is entitled to an equitable division of the property accumulated by their joint efforts during the time they lived together as man and wife.
Id. at 757, 52 So.2d at 629. Additionally, the supreme court generally explained in Chrismond that the putative wife was entitled to an equitable division of property in certain instances:
It is a general rule that when a woman in good faith enters into a marriage with a man who is incapable of contracting marriage because of some impediment, or when both of the parties enter into a void marriage in good faith, the woman is entitled to a division of the property accumulated by the joint efforts of the parties during their relationship, and on an annulment of the marriage the courts usually assume jurisdiction to make an equitable division and settlement of the property acquired during the cohabitation of the parties, either by way of a division of the property or an allowance to the wife in the nature of alimony, at least where she has lived as the wife of the other party in good faith.
Id. at 757-58, 52 So.2d at 629.
¶ 13. The next case cited by Steve is Taylor v. Taylor, 317 So.2d 422 (Miss. 1975). In Taylor, the wife was actually married to another man at the time she and Mr. Taylor married; however, Mr. Taylor knew of the wife's previous marriage and married her anyway. Taylor, 317 So.2d at 422. The couple lived together as husband and wife for nearly twenty years before they separated. Id.
The chancellor stated that after the parties had lived together in a relationship of husband and wife for a long period of time that it would not be fair and equitable for him to walk out and leave her as if she were a perfect stranger and that under the circumstances he owed some obligation to her. He allowed her $75 per month for thirty-six months as support. It was not designated as alimony....
The facts in this case demonstrate without question [that] the chancellor did what a decent regard for the sensibilities of humanity demanded. These people lived together and shared the vicissitudes of life for eighteen years. The separation cast her adrift just as surely as if she had been his lawful wife. The chancellor appears to have decided that the strict letter of the law ought not to require him to ignore that he was dealing with human beings. He did not make the allowance as alimony but as support. He felt the man had an obligation, and this Court is not disposed to reverse the manifestly just decree under the particular circumstances.
Taylor, 317 So.2d at 422-23.
¶ 14. In Pickens v. Pickens, 490 So.2d 872 (Miss.1986), the husband and wife *451 married in 1948, were divorced in 1962 and sometime the following year resumed cohabitation. Pickens, 490 So.2d at 873. They discussed remarriage, but the husband refused to take the legally required blood test, so they never remarried. Id. During the following twenty years, the couple maintained a marriage-type relationship, adding two additional children to their family. Id. The couple separated in 1983 with the wife filing a complaint in the chancery court requesting the chancellor to equitably divide the property accumulated during the time they lived together. Id. The chancellor noted in his judgement:
It is admitted by both that they held themselves out to the community as being married, and in all respects, save and except only the marriage ceremony, have conducted themselves as husband and wife. Their two youngest children were born during this time....
Robert Ellis Pickens earned more dollars than Norma Jean Pickens, but even so, she did the housework, and in my judgment the two of them were equal in their contributions to the ongoing of the family and the accumulation of the portion of the property now owned.
Pickens, 490 So.2d at 873-74. On appeal, the supreme court noted that while cohabitation is not equivalent to marriage, in the Pickens's case, an equitable division was due as a result of each spouse's joint effort to accumulate property, analogous to a common law business partnership. Id. at 875.
The principles of Chrismond and Taylor are controlling here. Where parties such as these live together in what must at least be acknowledged to be a partnership and where, through their joint efforts, real property or personal property, or both, are accumulated, an equitable division of such property will be ordered upon the permanent breakup and separation....
In determining what is an equitable division, the chancellor is by no means limited to a consideration of the earnings of the parties and cash contributions made by each to the accumulation of the properties. As any freshman economics student knows, services and in kind contributions have an economic value as real as cash contributions. In such situations, where one party to the relationship acts without compensation to perform work or render services to a business enterprise or performs work or services generally regarded as domestic in nature, these are nevertheless economic contributions.... They are to be valued by reference to the cost of similar services in the marketplace. Where, as here, the man accepted the benefit of such services, he will not be heard to argue that he did not need them and that their economic value should not be considered as the woman's economic contributions to the joint accumulation of property between them.

Pickens, 490 So.2d at 875-76 (emphasis added).
¶ 15. We finally look to Davis v. Davis, 643 So.2d 931 (Miss.1994), where the supreme court again addressed the issue of unmarried persons and equitable distribution. In Davis, Travis and Elvis Davis cohabitated for thirteen years without ever having been married, and one child was born to them during this time. The Davises held themselves out to the public as man and wife, and Elvis used the Davis surname. Davis, 643 So.2d at 932. Travis asked Elvis to marry him at least once, but she declined. Id. Travis listed Elvis as his wife in his 1984 will and listed her as his wife on his tax forms during their years together. During the course of their relationship, Travis's net worth increased from *452 $850,000 to over $7 million at the time of separation. Id. at 932-33. Elvis had no involvement in managing Travis's business affairs, but did admit to sharing in profits from his business. Id. at 933. Elvis kept the home in working order and managed the domestic affairs. Id. At their separation, Travis supplied Elvis with a home which had been remodeled and furnished, plus gave her money to buy household goods and bought her a new vehicle. Id. In 1986, Elvis filed a complaint to have the chancellor equitably distribute the assets acquired during their "partnership." Id. The chancellor found that Elvis did not have the same legal rights as a wife, and further, that she had failed to prove either the existence of a business partnership agreement or that any of Travis's assets were jointly accumulated. Id. Specifically, the chancellor stated, "She voluntarily assumed the unsanctioned role of mistress and failed to seek the law's protection through a marriage ceremony." Id. at 934.
¶ 16. In deciding the issue of Travis Davis's earnings, the supreme court looked to In re Estate of Alexander, 445 So.2d 836 (Miss.1984), which held that when no will existed, a woman was not entitled to inherit a life estate in the homestead of a man with whom she had cohabited and that any remedy was at the legislature's prerogative. Alexander, 445 So.2d at 839. Further, the supreme court distinguished the facts in Davis from those in Pickens, Taylor and Chrismond by finding that the Davises were never ceremonially married, nor was Elvis an innocent partner to a void marriage; to the contrary, Elvis rejected Travis's proposal of marriage. Davis, 643 So.2d at 936. In its conclusion, the supreme court stated:
When opportunity knocks, one must answer its call. Elvis Davis failed to do so and thus her claim is all for naught. Our legislature has not extended the rights enjoyed by married people to those who choose merely to cohabit. To the contrary, cohabitation is still prohibited by statute. Elvis was well-compensated during and after the relationship. We see no reason to advocate any form of "palimony" when the legislature has not so spoken.
Id.
¶ 17. When viewing the present case in light of the aforementioned precedents, we find the present case most closely aligns with the facts presented in Pickens, which relies on both Chrismond and Taylor. In both Pickens and the present case the couple was married for a period of time prior to divorcing and resuming cohabitation, in both cases children were added to the family after the divorce, in both cases one party refused to remarry when asked, and in both the wife sought compensation for domestic services. Referring back to Pickens, where one party to the relationship acts without compensation to perform work or render services to a business enterprise or performs work or services generally regarded as domestic in nature, these are nevertheless economic contributions to the joint accumulation of property between them. Pickens, 490 So.2d at 875-76. Accordingly, Debra contributed to the accumulation of property between herself and Steve, and we find the chancellor did not err in enforcing this Court's previous direction to award Debra a fair money judgment for her services in caring for the children and the home.
¶ 18. In distinguishing the present case from Davis, we note the manifest factual dissimilarities. In Davis, neither party was deceived into thinking he or she was married to the other, Travis voluntarily and amply provided Elvis with the necessities she would need upon their separation, Elvis did not contribute as a "partner" to *453 the development of Travis's business and none of his assets were jointly accumulated. Davis, 643 So.2d at 933.
¶ 19. The dissent would reverse and render the decision of the chancellor as well as reverse the previous decision of this Court, claiming that we incorrectly interpreted both Pickens and Davis and arguing that to affirm the chancellor's ruling is to sanction the award of palimony. We disagree. A close reading of Davis does not do away with Pickens, but merely enlightens the reader as to how and when Pickens should be applied. Here, Steve and Debra were more than "pals" by virtue of their previous marriage, their having a second child during their post-divorce period of cohabitation, their holding themselves out to the public as being husband and wife and through their relationship of provider and domestic caretaker. Steve and Debra resumed cohabitation approximately one month after their divorce, and but for want of obtaining another marriage license, they lived in the same relationship in which they had lived from 1973 through 1994, holding themselves out to the public as well as their two daughters as having legally remarried. While we do not sanction palimony, we do believe in equitable distribution consistent with each party's contribution.
¶ 20. This case presents a unique situation, not altogether unlike Chrismond, Taylor and Pickens, in which, although the previously married parties were not married at the time of separation, equity requires that the chancellor compensate the woman for her joint efforts in building the assets of the man. As a result, we find no error in the chancellor's adherence to this Court's prior directive to compensate Debra for her services as a caregiver.

III. DID THE COURT ERR IN ALLOWING THE TESTIMONY OF DEBRA'S EXPERT?
¶ 21. Steve next argues the court erred in accepting David Horn as an expert. "The admission of expert testimony is controlled by the trial judge's discretion. This Court will not disturb the trial judge's decision unless there was a clear abuse of that discretion." Stanton v. Delta Reg'l Med. Ctr., 802 So.2d 142(¶ 4) (Miss.Ct.App.2001) (citation omitted).
¶ 22. Steve contends that, while David Horn may have expert knowledge in the field of vocational rehabilitation, he was not an expert for the purpose for which he was calledto determine the economic value of Debra's contribution to the family during the years of her cohabitation with Steve. David Horn was a vocational rehabilitation expert who worked primarily with the Social Security Administration. He testified that he had a bachelor's degree, a masters degree in rehabilitation studies, had completed various graduate studies at different universities, and began his work as a vocational evaluator in 1968 with the Mississippi Department of Rehabilitation Services where he served as a counselor, supervisor, training director, and assistant director until his retirement in 1992. He testified that although he had been an expert witness in thousands of cases, he was not an expert in economics or statistics and had never been asked to determine or appraise the value of a wife doing household chores and providing child care. He further clarified, though, that "this is not rocket science," since one essentially simply takes the hours involved and multiplies by the appropriate wage. Horn explained that in arriving at the figure for Debra's services, he used the "replacement cost method," which uses the figure for what it would cost to have a person provide the services Debra performed. Horn consulted numerous economic and wage experts, talked to various homemakers and housewives, consulted *454 the Bureau of Labor Statistics, and arrived at his figure of $100,800 for 70 hours of domestic work per week a homemaker would contribute for service to a family of four.
¶ 23. Rule 702 of the Mississippi Rules of Evidence states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
¶ 24. Here, the chancellor took Horn's figure and deducted amounts for housing, food and the like and arrived at an adjusted figure of $70,000 due to Debra. The chancellor used the figure as a guide or reference from which to elicit his findings, and we recognize that, sitting as a trier of fact, he can give what weight he deems appropriate to the testimony of witnesses, including that of an expert. Finding Horn's testimony to be helpful in understanding the value of Debra's services, the chancellor stated, "The Court is of the opinion that Mr. Horn will be able to provide this Court assistance in deciding this issues before the Court from the knowledge he has acquired, and I will permit him to testify in that regard. The objection will be overruled." Referring to our previous recitation of the standard of review, we find the chancellor did not abuse his discretion in allowing Horn to testify as an expert regarding Debra's contribution.

IV. DID THE CHANCELLOR ERR IN CONCLUDING THAT STEVE WAS RESPONSIBLE FOR LAURA'S EDUCATIONAL EXPENSES INCURRED AFTER HER TWENTY-FIRST BIRTHDAY?
¶ 25. Steve next claims that, while the chancellor was correct in finding that no evidence existed concerning what loan funds were spent prior to Laura's twenty-first birthday, the chancellor erred in concluding that Steve should nevertheless be responsible for a portion of two loans which may have been utilized after Laura turned twenty-one. Our standard of review with this issue, again, allows that we only disturb the chancellor's findings if we find manifest error, abuse of discretion, or that the court applied an erroneous legal standard. Andrews v. Williams, 723 So.2d 1175(¶ 7) (Miss.Ct.App.1998).
¶ 26. Laura Wooldridge attended college and pharmacy school and turned twenty-one during her tenure in higher education. Steve argues that pursuant to Nichols v. Tedder, 547 So.2d 766 (Miss. 1989), twenty-one years of age was the "end-all" for purposes of emancipation (Miss.Code Ann. § 93-5-23 (Supp.2002), lists other factors which trigger emancipation[2]).
¶ 27. Laura took out two loans the fall before her twenty-first birthday, and the chancellor found that since it was unknown whether Laura used the loan proceeds for expenses incurred before or after her twenty-first birthday, Steve would be responsible for paying 65% of those loans. Steve argues that the chancellor could not *455 compel him to pay when the timing of the use of the funds was unknown. Laura testified that she did not receive a check for the loan proceeds, but the funds were remitted by the lender directly to the university to pay tuition and fees, and any balance was paid to her by the school, which she used for other school-related expenses.
¶ 28. The chancellor used his discretion to determine the timing of Laura's use of these funds. Considering the evidence presented and recognizing the chancellor's discretion, we find based on the record that the chancellor did not err in finding Steve responsible to pay 65% of the balance of these two loans.

V. DID THE CHANCELLOR ERR IN REQUIRING STEVE TO PAY DEBRA'S ATTORNEY'S FEES INCURRED IN RESPONDING TO HIS COMPLAINT REGARDING PAYING LAURA'S COLLEGE EXPENSES?
¶ 29. Steve finally argues that the chancellor erred in ordering him to pay $3,000 toward Debra's attorney's fees, which she incurred in defending against Steve's objection to paying Laura's educational expenses.
The question of attorney's fees in a divorce action is a matter largely entrusted to the sound discretion of the trial court. "If a party is financially able to pay her attorney, an award of attorney's fees is not appropriate." The criteria to be utilized in determining attorney's fees are found in McKee v. McKee, 418 So.2d 764 (Miss.1982).
East v. East, 775 So.2d 741(¶ 5) (Miss.Ct. App.2000). The McKee factors used in determining attorney's fees require an evaluation of the relative financial ability of the parties, the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case. McKee, 418 So.2d at 767. Here, Debra failed to present any evidence on this point for the chancellor's review. Thus, we find the chancellor erred in his award. We reverse and render on this point.

VI. AS ARGUED IN DEBRA'S CROSS-APPEAL, DID THE CHANCELLOR ERR IN CALCULATING STEVE'S OBLIGATION FOR LAURA'S EDUCATIONAL EXPENSES, ERR IN CALCULATING THE VALUE OF HER DOMESTIC SERVICES, AND IS SHE ENTITLED TO ATTORNEY'S FEES FOR A FRIVOLOUS APPEAL?
¶ 30. Debra's cross-appeal consists of rebuttals to Steve's issues on appeal. She re-argues evidence that was put before the chancellor and resolved by him, and we have resolved these issues in this opinion; thus, we will not further address these issues.
¶ 31. THE JUDGMENT OF THE CHICKASAW COUNTY CHANCERY COURT IS AFFIRMED IN PART AND REVERSED AND RENDERED IN PART ON DIRECT APPEAL AND AFFIRMED ON CROSS-APPEAL. COSTS OF THIS APPEAL ARE ASSESSED TWO-THIRDS TO THE APPELLANT AND ONE-THIRD TO THE APPELLEE.
KING, P.J., BRIDGES, THOMAS AND MYERS, JJ., CONCUR.
SOUTHWICK, P.J., DISSENTS WITH A SEPARATE WRITTEN OPINION JOINED BY MCMILLIN, C.J., IRVING AND CHANDLER, JJ.
GRIFFIS, J., NOT PARTICIPATING.
*456 SOUTHWICK, P.J., dissenting.
¶ 32. It is with respect for today's majority that I nonetheless am compelled to dissent. The Court states that it is not "sanctioning palimony," but then the majority proceeds to order it. The majority is pursuing a course that the Supreme Court has explicitly blocked, namely, the creation of entitlements akin to those applicable to divorce even though the two people that are severing their relationship were not married.
¶ 33. I am especially reluctant to dissent here, since the majority is largely applying its understanding of an opinion that this Court released in 1997 when we earlier reversed and remanded a decision reached in these parties' litigation. Wooldridge v. Wooldridge, 704 So.2d 469 (Miss. Ct.App.1997) (table), 96-CA-00637 Miss. Ct.App. (Nov. 18, 1997) ("Wooldridge I"). Nonetheless, I conclude that the 1997 opinion and the majority today are insisting on compliance with a Supreme Court decision that has been implicitly overruled.

1. Law of the Case
¶ 34. First I address a procedural question. Since this is the second appeal of this suit, the usual approach is unwaveringly to apply the earlier directions from this Court under the "law of the case" doctrine. This is embryonic res judicata, meaning that even before a suit is finally resolved, principles of law established on one appeal should continue to apply during later appeals.
The doctrine of the law of the case is similar to that of former adjudication, relates entirely to questions of law, and is confined in its operation to subsequent proceedings in the case. Whatever is once established as the controlling legal rule of decision, between the same parties in the same case, continues to be the law of the case, so long as there is a similarity of facts. This principle expresses the practice of courts generally to refuse to reopen what has previously been decided. It is founded on public policy and the interests of orderly and consistent judicial procedure.
Florida Gas Exploration Co. v. Searcy, 385 So.2d 1293, 1295 (Miss.1980), quoting Mississippi College v. May, 241 Miss. 359, 366, 128 So.2d 557, 558 (1961). As I noted in another recent example of a second appeal in the same litigation, if "a case returns to the appellate court that earlier ordered the proceedings that are under review, the importance of reconsidering the former statement of legal principles is subordinate to the benefits of consistency and finality." Harris Propane Inc. v. Mississippi Transportation Comm'n, 827 So.2d 6, 9-10 (Miss.Ct.App.2002) (Southwick, P.J., concurring); rev'd and rem. on first appeal, 708 So.2d 103 (Miss.Ct.App. 1998) (table).
¶ 35. I would not apply the "law of the case" principle for three reasons. One is because of a recognized exception: "rare cases where the decision is manifestly and palpably erroneous and to follow it would result in grave injustice being done." Florida Gas, 385 So.2d at 1295, quoting Brewer v. Browning, 115 Miss. 358, 366, 76 So. 267, 270 (1917). Secondly, since the 1997 opinion was unpublished, it is not precedent. We are making precedent today. Finally, I find an error in the admission of the expert testimony used in this case. This would require another remand, eliminating the "benefits of consistency and finality" that underlay the rule. That error is not further addressed, since its effect is cumulative to these other points. There is no reason to insist that the trial judge conduct new proceedings to enforce an incorrect appellate court ruling.
¶ 36. Since the time that law-of-the-case principles were established in this state, *457 this intermediate appellate court has been created. I find no additional weight to those principles arising from the fact that Mr. Wooldridge did not challenge Wooldridge I by seeking a writ of certiorari at that time. Obviously if the Supreme Court had also reviewed the earlier appeal and affirmed our resolution, we would be bound by supreme authority. Yet when a writ was not sought or else was denied, there is no reason to rewrite the usual "law of the case" principles. This Court is being asked to reconsider in a second appeal the decision it reached in the first. Usually it should not, but for the reasons already stated I find that this is an exceptional case that requires the exception to be applied.

2. "Palimony"
¶ 37. As to the substance, I begin with the significant sections of our earlier opinion:
The Mississippi Supreme Court has definitively spoken on the issue of so-called palimony, declaring that equitable division of property between two cohabitating partners is not allowed, and that it is the province of the legislature, not the courts, to create such a right. Davis v. Davis, 643 So.2d 931, 936 (Miss.1994). However, in light of unique factual situations, the supreme court has allowed division of property for couples cohabitating without the benefit of marriage. In Pickens v. Pickens, the court held:
Notwithstanding [the lack of a legal marriage], upon permanent separation, our law authorizes and sanctions an equitable division of property accumulated by two persons as a result of their joint efforts. This would be the case were a common law business partnership breaking up. It is equally the case where a man and woman, who have accumulated property in the course of a non-marital cohabitation, permanently separate.
490 So.2d 872, 875 (Miss.1986). In Pickens, the couple had been married for several years before they divorced. After their divorce, they resumed twenty years of uninterrupted cohabitation, with both partners gainfully employed. Unlike the chancellor in the present case, the Pickens court held that their accumulated wealth was a result of their joint efforts.
The supreme court, despite the rather broad pronouncement in Pickens, has appeared somewhat reluctant to invoke its authority to grant relief of this nature, historically doing so only when the inequity of not providing some form of relief is apparent. [Facts and holdings of two pre-Pickens cases discussed. Chrismond v. Chrismond, 211 Miss. 746, 52 So.2d 624 (1951); Taylor v. Taylor, 317 So.2d 422, 422 (Miss.1975).]
Recently, the supreme court dealt with a case where the chancellor declined to make an equitable distribution of assets when a non-married couple ended a thirteen-year relationship that produced a child. Davis v. Davis, 643 So.2d 931 (Miss.1994). The court framed the issue and answered it very succinctly.
At issue is whether an individual who has cohabited with another without the benefit of marriage is entitled to a share of the assets accumulated during the relationship. Because the endorsement of any form of "palimony" is a task for the legislature and not this court, we affirm the chancellor's decision.
Id. at 932.
In Davis, the man's net worth had grown, during the term of the relationship, from approximately $850,000 to over $7,000,000. Id. at 931. The court *458 recognized, and even quoted, the broad language from the Pickens case that we quoted above, but refused to apply it, saying that "[t]he Pickens Court noted that it was faced with `an arguably unique factual setting.'" Id. at 935. The court also commented on the fact that, in Davis, there was never a ceremonial marriage, nor was the woman "an innocent partner to a void marriage." Id. at 936.
In the instant case, there was a ceremonial marriage as well as the birth of a second child. But unlike Pickens, the chancellor in this case held that Debra failed to prove that Steve's real estate and other property holdings were a result of their joint efforts. In fact, he went further, stating that she did not deserve the benefits and protection afforded married people. Still he awarded her one half interest in Steve's Bowles property. While we agree that Debra is not entitled to an equitable division of property, there is some credence to the chancellor's holding that Debra expended considerable time, energy, and her own money to raise and tend to the children as well as taking care of Steve and the family home. The supreme court spoke to such contributions in Pickens:

As any freshman economics student knows, services and in kind contributions have an economic value as real as cash contributions. In such situations, where one party to the relationship acts without compensation to perform work or render services to a business enterprise or performs work or services generally regarded as domestic in nature, these are nevertheless economic contributions.
Pickens, 490 So.2d at 876 (citations omitted).
Wooldridge I, 704 So.2d 469 (table), 96-CA-00637 COA (Nov. 18, 1997), slip op. at 6-8.
¶ 38. In our earlier interpretation, we applied Pickens despite acknowledging that it was now questionable authority. I now find that we strayed too far afield from the narrow discretion afforded by the precedents. Our reliance should instead have been on Davis. The latter opinion held that cohabitation can create an implied partnership when property is accumulated through joint efforts. When that occurs, Davis continues to require the property's division. We found in Wooldridge I that the property in issue, the Bowles property, had not been acquired due to joint efforts. Yet we did not stop with determining that no property had been accumulated due to joint efforts. If we had, the case would have been over with no distribution ordered. Instead we sought to have Debra Wooldridge's services to the household valued and money paid as a result, effectively ordering "palimony" despite lacking the authority to do so. No property acquired through common efforts is being redistributed. Instead, a person's non-compensated efforts through the post-marriage years are being valued and an award of money then being awarded. Whatever that is, and the majority rejects the "palimony" label, it is not common law partnership property distribution.
¶ 39. What was not fully considered in our 1997 opinion is that statutes and judicial precedents take what may be quite diverse contributions of partners to a marriage and then equates them in a manner that does not apply to the contributions of people in other relationships. As a result, the members of a marriage have entitlements at the time of a divorce that are not the rights applicable to the dissolution of relations between unmarried couples. If *459 the rights were the same, the effect would be to make a marriage irrelevant to the decisions of a chancellor at the time of dissolution of whatever a relationship might be labeled. That may have been the purpose of Pickens, but it was a purpose repudiated in Davis. The court there held that "public policy questions of such magnitude are best left to the legislative process, which is better equipped to resolve the questions which inevitably will arise as unmarried cohabitation becomes an established feature of our society." Davis, 643 So.2d at 934, quoting Carnes v. Sheldon, 109 Mich.App. 204, 311 N.W.2d 747, 753 (1981).
¶ 40. The Davis pronouncements have not been superseded. They control over Pickens. When the Davis court found that Pickens involved an "arguably unique factual setting," the court was gently all but overruling the precedent. There is nothing in the facts before us, some of which are similar to Pickens, that undermine the new foundation laid by Davis. The parties intentionally dissolved their marital relationship in 1983 but decided soon thereafter not to dissolve their residential, financial and sexual relationships. That was their decision, one with consequences.
¶ 41. What I find we must now do is address a self-inflicted obligation of correcting the misdirection which this Court (this judge included) set in motion. The record and the consistent findings of both the chancellor and this Court reveal no proof of direct contribution or joint efforts undertaken by Ms. Wooldridge to accumulate specific property that is still to be distributed. No economic award akin to alimony is proper. The demands of equity do not require an economic award based on non-economic contributions in a non-marital partnership. The chancellor's award of $70,000 and the companion lien in favor of Ms. Wooldridge against the Bowles property should be reversed. I would enter judgment that no such monetary payment is appropriate.

3. Child support
¶ 42. There remain additional matters for our determination. The lower court was also asked to rule on certain loans incurred by the Wooldridges' older daughter while attending pharmacy school. In his final judgment, the chancellor found that an earlier judgment for child support satisfied by Mr. Wooldridge did not include student loans for $1,500 and $17,000 taken out by Laura in the fall before her twenty-first birthday. The chancellor found "no proof to show whether all of these two loans were used for educational expenses Laura had incurred prior to her 21st birthday or whether some of the proceeds of these loans were used for expenses incurred after Laura attained age 21 on February 26, 1997." Nevertheless, the chancellor ordered Mr. Wooldridge to pay 65% of the outstanding principal and interest on the two debts.
¶ 43. Because the order from the first trial required Mr. Wooldridge to provide his daughter "the necessary, reasonable funds with which to attend college," it is clear from the chancellor's apportionment that he found 65% of the loan proceeds were utilized prior to Laura's majority. Both parties challenge this award. Mr. Wooldridge asserts that in admitting a lack of proof as to the timing of Laura's expenditures, the chancellor effectively foreclosed a judgment against him for any portion of the loan. Conversely, Ms. Wooldridge submits that the statutory guidelines for child support bestow discretion upon the chancellor to direct support payments that reach beyond majority, thus entitling Ms. Wooldridge to the full amount of the loans.
*460 ¶ 44. I address Ms. Wooldridge's claim first. The statutory amendment adopted prior to the entry of the judgment in Wooldridge I stated this:
The duty of support of a child terminates upon the emancipation of the child. The court may determine that emancipation has occurred and no other support obligation exists when the child:
(a) Attains the age of twenty-one (21) years, or
(b) Marries, or
(c) Discontinues full-time enrollment in school and obtains full-time employment prior to attaining the age of twenty-one (21) years, or
(d) Voluntarily moves from the home of the custodial parent or guardian and establishes independent living arrangements and obtains full-time employment prior to attaining the age of twenty-one (21) years.
Miss.Code Ann. § 93-5-23 (Supp.2002). This list is non-exclusive, and other situations which give rise to emancipation may be considered. Rennie v. Rennie, 718 So.2d 1091, 1093 (Miss.1998). Ms. Wooldridge suggests that the permissive language of the statute grants the chancellor the authority to establish support awards extending beyond majority. That is incorrect.
¶ 45. I find no support for the proposition that a child may remain "unemancipated" beyond the age of twenty-one. The Mississippi Supreme Court has already established "once and for all what is the age of majority in this State for purposes of child care and maintenance orders." Nichols v. Tedder, 547 So.2d 766, 769 (Miss.1989). The amendment to section 93-5-23 in 1996 did nothing to shift this bright-line rule that twenty-one is the age of majority. See Arthur v. Arthur, 691 So.2d 997, 1001 (Miss.1997). Emancipation upon attainment of majority is an important date with regard to child support obligations, because "the chancellor has no authority to order post-majority support beyond that specifically contracted by the parties." Gambrell v. Gambrell, 650 So.2d 517, 521 (Miss.1995). Here, the parties did not so contract. Mr. Wooldridge's obligations for support for Laura terminated with her emancipation, upon her attainment of age twenty-one.
¶ 46. Where Ms. Wooldridge challenges the legal principles regarding the award, Mr. Wooldridge attacks the evidence for the award. Relying on the chancellor's finding that there was no proof offered to show whether Laura used the loans for her educational expenses pre- or post-majority, Mr. Wooldridge concludes that "[i]t is fundamental that where a party's proof for a claim fails, no award may be made." This is a misapplication of the "fundamental" equities of the case. There is no dispute that Laura utilized at least a portion of the loan proceeds prior to attaining her majority in February of 1997. I find the chancellor's apportionment of 65% of the proceeds pre-majority to be reasonable, based on the record before us.

4. Attorney's fees
¶ 47. Finally, I consider the chancellor's award of attorney's fees in the amount of $3,000 to Ms. Wooldridge. Typically, an award of attorney's fees "in domestic relations matters is entrusted to the sound discretion of the trial court." Poole v. Poole, 701 So.2d 813, 818 (Miss.1997). That necessarily means that the chancellor avoid abusing his discretion or committing manifest error. Grogan v. Grogan, 641 So.2d 734, 744 (Miss.1994). In order to ensure such compliance on the part of chancellors, the Mississippi Supreme Court adopted certain factors to be considered in awarding fees. McKee v. McKee, *461 418 So.2d 764, 767 (Miss.1982).[3] In this case, neither party produced any evidence from which the chancellor could assess the propriety of an award of fees. This also is not a divorce case, but one dissolving at most a common-law partnership.
¶ 48. At least in the absence of such evidence before him, I find that the chancellor erred in awarding Ms. Wooldridge attorney's fees. It may also have been error to award fees no matter the evidence since this is not a divorce case. That award should be reversed and judgment rendered awarding no attorney's fees.

Conclusion
¶ 49. With respect for the opposing view of those joining the majority opinion, I find that we erred in 1997 and err again in 2003. Davis permits distribution of property after dissolution of a common law partnership. That is not what we order. Instead, an order for a money payment due to services rendered is being left in place.
¶ 50. I would reverse the award of palimony and of attorneys' fees and enter judgment here.
McMILLIN, C.J., IRVING AND CHANDLER, JJ., JOIN THIS SEPARATE WRITTEN OPINION.
NOTES
[1] Wooldridge v. Wooldridge, 704 So.2d 469 (Miss.Ct.App.1997) (unpublished).
[2] The duty of support of a child terminates upon the emancipation of the child. The court may determine that emancipation has occurred and no other support obligation exists when the child: (a) attains the age of twenty-one (21) years, or (b) marries, or (c) discontinues full-time enrollment in school and obtains full-time employment prior to attaining the age of twenty-one (21) years, or (d) voluntarily moves from the home of the custodial parent or guardian and establishes independent living arrangements and obtains full-time employment prior to attaining the age of twenty-one (21) years. Miss.Code Ann. § 93-5-23 (Supp.2002).
[3] The McKee factors to be considered are:

(1) the relative financial ability of the parties;
(2) the skill and standing of the attorney employed;
(3) the nature of the case and novelty and difficulty of the quiestions at issue;
(4) the degree of responsibility involved in the management of the cause;
(5) the time and labor required;
(6) the usual and customary charge in the community; and
(7) the preclusion of other employment by the attorney due to the acceptance of the case.