920 So.2d 528 (2006)
Katherine V. DEAN, Appellant
v.
John Kelly KAVANAUGH, Individually, and as Administrator of the Estate of Robert C. Kavanaugh, Deceased, Appellee.
No. 2004-CA-01144-COA.
Court of Appeals of Mississippi.
January 24, 2006.
*530 Kathleen Fitzgerald Treadwell, Landman Teller, Vicksburg, attorneys for appellant.
Kenneth B. Rector, Vicksburg, attorney for appellee.
Before KING, C.J., CHANDLER and ISHEE, JJ.
CHANDLER, J., for the Court.
¶ 1. Katherine Dean and Robert Kavanaugh were involved in a romantic relationship but were never officially married. Kavanaugh died on October 22, 2000, after a long period of poor health. Dean cared for Kavanaugh during his illnesses. Kavanaugh had three sons from a prior marriage, and they were his sole heirs at law.
¶ 2. Approximately one year before his death, Kavanaugh opened a joint checking account with Dean. Approximately four months before his death, Kavanaugh opened a second joint account with Dean. When Kavanaugh died, Dean told Kavanaugh's sons that he had died virtually penniless. Dean later disclosed the existence of the earlier joint account, which she divided equally between herself and Kavanaugh's sons, but she did not disclose the existence of the second account.
¶ 3. Kavanaugh's children sued to recover the proceeds from the second joint account. The Warren County Chancery Court found that a confidential relationship *531 existed between Dean and Kavanaugh and that Dean had failed to rebut the presumption of undue influence. Accordingly, the court granted the relief Kavanaugh's sons requested. Dean appeals, raising the following issues:
I. WHETHER A CONFIDENTIAL RELATIONSHIP EXISTED BETWEEN DEAN AND KAVANAUGH
II. WHETHER DEAN SUCCESSFULLY REBUTTED THE PRESUMPTION OF UNDUE INFLUENCE
¶ 4. Finding no error, we affirm.

FACTS

(a) Robert Kavanaugh's and Katherine Dean's Relationship
¶ 5. Katherine Dean began a romantic relationship with Robert Kavanaugh in October of 1984. The two of them had known each other for many years prior to that time. In 1990, Dean and Kavanaugh began living together. Although they never officially married, they held themselves out to be husband and wife. Kavanaugh had three children from a prior marriage, John Kelly Kavanaugh, Michael Kavanaugh, and Patrick Kavanaugh. Dean had one daughter from a prior marriage, Lillian Parrish.
¶ 6. Kavanaugh was diagnosed with skin cancer on multiple occasions. During that time, Dean changed the dressings on his cancers and the linens on his bed every evening. Dean also rubbed salve on the cancers at night. The cancers eventually required surgery and radiation. Dean transported Kavanaugh to the hospital for the medical procedures and tended to his medical needs when he returned home.
¶ 7. In 1996, Kavanaugh had a gangrenous gall bladder, bleeding ulcers, and renal failure. Dean cared for Kavanaugh during these episodes.
¶ 8. In 1997, Dr. George Kilgore determined that Kavanaugh's right artery was completely blocked and that his artery was not supplying blood to his brain. As a result, Kavanaugh began having problems talking and communicating. Dr. Kilgore and Dr. George Habeeb performed surgery on Kavanaugh. Upon Kavanaugh's discharge from the hospital, Dr. Habeeb stated that Kavanaugh's "mental status [has] improved and he has no further neurological deficits."
¶ 9. In 1998, Kavanaugh was diagnosed with colon cancer. A tumor was removed in January of 1999. In 1999, the cancer spread to his liver and lungs and he was declared terminally ill.
¶ 10. Kavanaugh's health deteriorated substantially in 2000, the year of his death. Beginning in February of 2000, Kavanaugh was prescribed medication for cancer-related pain and "tumor fever." On July 11, 2000, Dr. Habeeb found that Kavanaugh could no longer take anticoagulation medication for his cerebrovascular disease "because he is very weak and he is at risk for falling down." In the summer of 2000, Kavanaugh was confined to a wheelchair because of his physical weakness. Kavanaugh had difficulty speaking and the vision in his left eye was impaired to the extent that he could read only very large print. Kavanaugh's weight dropped from 194 pounds on January 18, 2000 to 135 pounds on September 1, 2000. As of September 1, 2000, Dr. Habeeb stated that Kavanaugh was under hospice care, on oxygen, and taking the morphine drug MS Contin.
¶ 11. During all of Kavanaugh's illnesses, Dean assisted Kavanaugh with bathing, using the restroom, cutting his nails, cutting his hair, and shaving. She washed his clothes, cooked his food, and assisted him with his medications and other medical *532 care. She accompanied him to obtain medical treatment, was present in the room while the procedures were performed, took him to the emergency room, and stayed with him during his periods of hospitalization.
¶ 12. Kavanaugh died on October 22, 2000. He was eighty-one years old at the time of his death. His three sons were his sole heirs at law.

(b) Account Number XXX-XXX-X
¶ 13. Kavanaugh opened a checking account, account number XXX-XXX-X, at Merchants National Bank, now BancorpSouth Bank, on November 22, 1982. On July 27, 1999, Kavanaugh added Dean to the checking account. According to Dean, this was done to enable Dean to "be able to pay his (Kavanaugh's) bills." At that time, Kavanaugh had terminal cancer and Dean was his caregiver. At the time the joint ownership was created, the account had a balance of $103,498.74.
¶ 14. On May 9, 2000, Dean drove Kavanaugh to the bank again so that Kavanaugh could close an account in the name of "Robert C. Kavanaugh, Trustee for Patrick H. Kavanaugh." The proceeds of the account, totaling $106,163.56, were deposited into account number XXX-XXX-X.
¶ 15. On August 7, 2000, Dean drove Kavanaugh to the bank, and Kavanaugh withdrew $100,000 from account number XXX-XXX-X, and placed the proceeds into account number XXXXXX. On the day Kavanaugh died, account number XXX-XXX-X contained a balance of $121,827.96. Shortly after Kavanaugh died, Dean transferred $5,000 from account number XXX-XXX-X and placed the proceeds into her personal checking account. On January 3, 2001, she withdrew $17,000 from the account to purchase a new automobile. Dean did not deposit any of her personal funds into account number XXX-XXX-X at any time.

(c) Account Number XXXXXX
¶ 16. On June 22, 2000, Kavanaugh went to BancorpSouth and opened account number XXXXXX, held jointly with Dean. The initial deposit of $24,220.26 came from the proceeds of a certificate of deposit owned by Kavanaugh. On June 26, 2000, Kavanaugh closed an account in the name of "Robert C. Kavanaugh, Trustee for John Kelly Kavanaugh." The balance of the account, totaling $105,583.53, was transferred into account number XXXXXX. On the date of Kavanaugh's death, account number XXXXXX contained a balance of $230,442.43. On January 23, 2001, Dean transferred the balance of the account in the amount of $216,438.33 into an account that Dean held jointly with her daughter. She closed the account on February 20, 2001. Dean did not deposit any of her personal funds into account number XXXXXX at any time.

(d) Kavanaugh's Real Property
¶ 17. Kavanaugh owned two pieces of real property in Warren County. Dean convinced Kavanaugh to give her a twenty-five percent interest in the real property. Kavanaugh prepared and signed a deed that conveyed to Dean twenty-five percent of his real property, with Kavanaugh's sons receiving, in equal shares, the remaining seventy-five percent of the property.

(e) Procedural History
¶ 18. Immediately after Kavanaugh's death, Dean told Kavanaugh's sons that he had gambled away all of his money and died virtually penniless. Dean also destroyed all of Kavanaugh's bank records. However, on January 18, 2001, Kavanaugh's sons confronted Dean about their father's bank accounts, at which time she disclosed the existence of account number XXX-XXX-X. She divided the balance of the *533 account, $92,851.90, with the three Kavanaugh children, retaining one-fourth of the account balance for herself. This arrangement was acceptable to Kavanaugh's children because their father had told them repeatedly that he wanted Dean to receive one-fourth of the assets. Dean, however, did not disclose that $100,000 had been transferred from account number XXX-XXX-X to account number XXXXXX. In addition, she did not disclose the existence of account number XXXXXX.
¶ 19. John Kavanaugh, the administrator of the estate, filed suit against Dean demanding the return of $216,438.33 in funds in checking account number XXXXXX, the $5,000 withdrawn on November 14, 2000, and the $17,000 withdrawn on January 3, 2001. The Warren County Chancery Court found that a confidential relationship existed between Kavanaugh and Dean and that Dean failed to overcome the presumption of undue influence. Accordingly, the court granted the relief requested by the Kavanaugh children.

ANALYSIS
¶ 20. On appeal, this Court does not reverse a chancellor's findings when there is substantial evidence supporting those findings. Mullins v. Ratcliff, 515 So.2d 1183, 1189 (Miss.1987). This Court accepts all facts and reasonable inferences which support the chancellor's findings. Id. The findings will not be disturbed unless the chancellor abused his discretion, was manifestly wrong, or applied an erroneous legal standard. Bowers Window and Door Co. v. Dearman, 549 So.2d 1309, 1313 (Miss.1989).

I. WHETHER A CONFIDENTIAL RELATIONSHIP EXISTED BETWEEN DEAN AND KAVANAUGH
¶ 21. The contestant has the burden of proving the existence of a confidential relationship. In re Estate of Dabney, 740 So.2d 915, 919(¶ 12) (Miss.1999). The Mississippi Supreme Court has articulated factors to be considered in determining if and when a confidential relationship exists. These factors include (1) whether one person has to be taken care of by another; (2) whether one person maintains a close relationship with another; (3) whether one person is provided transportation and has their medical care provided for by another; (4) whether one person maintains a joint account with another; (5) whether one is physically or mentally weak; (6) whether one is of advanced age or poor health; and (7) whether there exists a power of attorney between the one and the another. Id. The chancellor considered these elements and found that the presumption of undue influence applied because six of the seven factors were present in the case at bar.

(1) Whether Kavanaugh was taken care of by Dean
¶ 22. Kavanaugh lived with Dean in her home and no one else lived with them. Kavanaugh was in very poor health for an extended period of time. He had a long history of serious medical problems, including multiple skin cancers that required surgery and radiation. In addition, he had colon cancer, gastroesophageal reflux disease, Barrett's esophagitis, hypothyrodism, attrial fibrillation, hypertension, peptic ulcer Disease, actinic keratosis, upper GI bleeding and prostatic hypertrophy. As a result of his illnesses, Dean bathed Kavanaugh, cut his toenails, shaved him, cut his hair, cooked for him, and changed the dressings on his skin due to his skin cancers. Dean would also write checks for Kavanaugh at Kavanaugh's direction.

(2) Close Relationship
¶ 23. Kavanaugh resided with Dean in her home for more than ten years. They were involved in a romantic relationship.

*534 (3) Transportation and Medical Care
¶ 24. Dean provided Kavanaugh with transportation to his doctor when Kavanaugh's physician instructed him not to drive.

(4) Joint Banking Accounts
¶ 25. On July 27, 1999, Kavanaugh changed account number XXX-XXX-X from an individual account to a joint ownership account, naming Dean as joint owner. On June 22, 2000, Kavanaugh opened account number XXXXXX at BancorpSouth, naming Dean as joint owner.

(5) Physical Or Mental Weakness
¶ 26. Kavanaugh's death followed a long period of very poor physical health.

(6) Advanced Age or Poor Health
¶ 27. Kavanaugh was eighty-one years old when he died and was in poor health for many years prior to his death.

(7) Existence of a Power of Attorney
¶ 28. There was no power of attorney executed by Kavanaugh.
¶ 29. Dean does not contest the chancellor's conclusion that she was involved in a confidential relationship with Kavanaugh. Rather, she argues that her confidential relationship should not give rise to a presumption of undue influence because she and Kavanaugh were involved in a romantic relationship and because Dean held herself out to be the wife of Kavanaugh. To support her position, Dean cites Wooldridge v. Wooldridge, 856 So.2d 446 (Miss.Ct.App.2003). In that case, an ex-wife and an ex-husband resumed cohabitation approximately one month after their divorce. This Court found that since the ex-wife contributed to the accumulation of the couple's property, in equity, she should be entitled to an award for her services rendered after the divorce. Id. at 452(¶ 17).
¶ 30. The Wooldridge opinion does not hold that unmarried couples are entitled to the same benefits upon dissolution of the relationship as would be applicable to married couples. To the contrary, this Court went to considerable lengths to emphasize the particular facts in Wooldridge:
Here, Steve and Debra were more than "pals" by virtue of their previous marriage, their having a second child during their post-divorce period of cohabitation, their holding themselves out to the public as being husband and wife and through their relationship of provider and domestic caretaker. Steve and Debra resumed cohabitation approximately one month after their divorce, and but for want of obtaining another marriage license, they lived in the same relationship in which they had lived from 1973 through 1994, holding themselves out to the public as well as their two daughters as having legally remarried.
Id. at 453(¶ 19).
¶ 31. The cohabitation that existed between Dean and Kavanaugh violated Mississippi law. Miss.Code Ann. § 97-29-1 (Rev.2000). Furthermore, the existence of a common law marriage is not recognized as a marriage in Mississippi. Miss. Code Ann. § 93-1-15 (Rev.2004).
¶ 32. According to Dean, Kavanaugh asked her to marry him but she refused to marry him. In Davis v. Davis, 643 So.2d 931, 932 (Miss.1994), Elvis Davis a/k/a Elvis Ray and Travis Davis cohabitated for thirteen years. Travis asked Elvis to marry him but she refused. Id. When Travis and Elvis separated, Elvis sued to claim her share in the assets that Travis accumulated during their years of cohabitation. The chancellor dismissed Elvis' complaint, and the Mississippi Supreme Court affirmed. *535 The court stated: "[w]hen opportunity knocks, one must answer its call. Elvis Davis failed to do so and thus her claim is all for naught. Our legislature has not extended the rights enjoyed by married people to those who choose merely to cohabit. To the contrary, cohabitation is still prohibited by statute." Id. at 936.
¶ 33. The chancellor was correct in finding that Dean was in a confidential relationship that gives rise to a presumption of undue influence. Dean and Kavanaugh were not married, and they were involved in a relationship that our legislature prohibits.

II. WHETHER DEAN SUCCESSFULLY REBUTTED THE PRESUMPTION OF UNDUE INFLUENCE
¶ 34. When circumstances give rise to a presumption of undue influence, the burden of proof shifts to the grantee to establish by clear and convincing evidence the validity of the gift. Madden v. Rhodes, 626 So.2d 608, 624 (Miss.1993). The Mississippi Supreme Court has established a three-pronged test to overcome the presumption of undue influence. The three prongs are (1) that the grantee/beneficiary acted in good faith; (2) that the grantor had full knowledge and deliberation of his actions and the consequences of those actions; and (3) that the grantor exhibited independent consent and action. Murray v. Laird, 446 So.2d 575, 578 (Miss. 1984).

(A) Good Faith
¶ 35. The Mississippi Supreme Court has identified five factors to determine whether the gift was executed in good faith. These factors are (1) determination of the identity of the initiating party in seeking preparation of the instrument; (2) the place of the execution of the instrument and in whose presence; (3) the consideration and fees paid, if any; (4) by whom paid; and (5) the secrecy and openness of the execution of the instrument. Id. The relevant factor in the present case is the secrecy of the transactions.
¶ 36. After Kavanaugh's death, Dean destroyed all of Kavanaugh's bank records. Immediately after Kavanaugh's death, Dean told Kavanaugh's sons that he had gambled away his money. When Kavanaugh's sons threatened her with a lawsuit, she disclosed the existence of only one account, which she divided equally between herself and Kavanaugh's sons. She never disclosed the existence of the remaining account.
¶ 37. Dean argues that Kavanaugh's banking transactions were not executed in secrecy because he discussed his intentions with bank officers Tammy Knight and B.J. Presley, whom Dean describes as "bank personnel who had known Kavanaugh and aided him for many years." However, there was no evidence that the bank officers provided anything other than ministerial services to Kavanaugh. There was no testimony suggesting that the bank officers made any efforts to explain to Kavanaugh the legal consequences of his actions or to ascertain whether he appreciated the legal consequences of his actions. Kavanaugh never discussed with either Presley or Knight his intentions to leave Dean his money after his death. To the contrary, when Kavanaugh opened the joint account, Dean stated that Kavanaugh wanted her to be in a position to pay his bills if he were unable to do so. Finally, Presley and Knight never testified that they were involved in the closing of the accounts Kavanaugh held in trust with his sons or the transfer of the $100,000 from account number XXX-XXX-X to account number XXXXXX.
¶ 38. Dean claims that the bank representatives informed Kavanaugh that by establishing the joint accounts, Dean would *536 become the owner of the remaining money at his death. To support this claim, she refers to the testimony of Knight, who stated, "I just verified what he wanted, and we closed it [the trust accounts Kavanaugh held for his sons] and put the money in the joint account." This statement does not support the contention that Kavanaugh knew that the funds in his bank accounts would pass exclusively to Dean outside his estate upon his death.
¶ 39. Presley admitted that she could not recall that Kavanaugh wanted to add Dean as a joint owner on his checking account. On cross-examination, Presley recanted:
Q: It's true, isn't it, Ms. Presley, you don't really remember the words that Bob Kavanaugh used in July, 1997[sic], do you?
A: No, I cannot say that I recall the exact words.
Q: You said in direct examination in response to a question by Mr. Bost that Mr. Kavanaugh wanted to make Katherine a quote a joint owner on his checking account, end quote?
A: Right.
Q: Do you remember if he used those exact words?
A: No.
Presley also admitted that she had no recollection of having dealt with Kavanaugh on a prior occasion:
Q: Were there other occasions when you dealt with Mr. Kavanaugh?
A: Probably, yes, but I don't really recall any specific things that I might have done.
Q: You don't remember whether or not he might have come in to see you on another occasion or later on with regard to any of his accounts?
A: Not that I know of.
¶ 40. Dean suggests that her good faith is demonstrated by the fact that she cared for Kavanaugh during his time of need. However, on the issue of good faith, the chancellor was entitled to consider the uncontested testimony from Kavanaugh's sons that Dean opted to refinish the hardwood floors in her home in the fall of 2000. Kavanaugh's son moved Kavanaugh to a hotel while Dean proceeded with her remodeling. The chancellor was also entitled to consider the fact that Dean's house remodeling occurred after she had obtained ownership of all of Kavanaugh's money and procured for herself a twenty-five percent interest in his real property.

(B) Knowledge and Deliberation
¶ 41. Dean asserts that Kavanaugh was aware of his assets and their general value. However, she presented no evidence at trial showing that Kavanaugh knew the value of his assets. In fact, more than $200,000 of the money transferred into the joint bank account did not belong to Kavanaugh but was held by him in trust for the benefit of his sons.
¶ 42. Dean states that Kavanaugh knew the ramifications of owning joint accounts because he owned joint accounts in the past. The appellant in Madden made a similar contention, which the supreme court rejected. The court stated, "Madden contended Sierra knew the consequences of his actions because he and Anne Sierra had held their house as joint tenants, with right of survivorship. However, Madden's contention relies on an assumption. Assumptions fall far short of the clear and convincing evidence required." Madden, 626 So.2d at 622.
¶ 43. Elma Hebler, a close personal friend of Dean, testified that Kavanaugh told her in phone conversations that "I'm leaving everything that I have to her (Dean)." Hebler testified on direct examination *537 that Kavanaugh made this statement each time they talked. On cross-examination, she said that these statements were never made to her during any of the face-to-face visits that Hebler and her husband had with Kavanaugh but rather was said only in phone conversations. Therefore, there was no proof that Kavanaugh made these statements outside the presence of Dean. According to Hebler, Kavanaugh discussed this one personal matter with her and no others.
¶ 44. The testimony of Hebler does not address the issue of whether Kavanaugh had adequate knowledge and deliberation of his actions when he stated that he wanted to leave everything to Dean. As a result of their confidential relationship, it is presumed that Kavanaugh's intent to "leave everything I have" to Dean was the result of her undue influence over him. This point was made by the Madden court when it stated:
We are not called upon to try to ascertain Sierra's intentions, nor is Madden called upon to try to prove them. What is required of Madden is to give clear and convincing proof that she showed good faith, that Sierra had full knowledge and deliberation of precisely what he was doing and its consequences and that Sierra showed independent consent and action.
Madden, 626 So.2d at 621.
¶ 45. Dean failed to show that Kavanaugh had full knowledge of the consequences of his acts when he transferred his assets to a bank account he held jointly with Dean, as demonstrated by the fact that he told his sons explicitly and on multiple occasions that he wanted his estate shared equally between Dean and his children. The evidence shows that Dean understood that this was Kavanaugh's intention because she suggested to Kavanaugh that he divide his real property four ways, with Dean receiving twenty-five percent of the land and Kavanaugh's three sons receiving seventy-five percent of the land. She also confirmed that Kavanaugh intended for his property to be divided equally when she divided account number XXX-XXX-X equally between herself and Kavanaugh's sons in January of 2001. Finally, all evidence at trial shows that Kavanaugh maintained a good relationship with his sons and had no reason to exclude them from receiving a lesser share of his money. The chancellor was presented with substantial evidence to find that Dean failed to show, by clear and convincing evidence, that Kavanaugh had full knowledge and deliberation of his actions.

(C) Independent Consent and Action
¶ 46. The Mississippi Supreme Court has held that the best way to show independent consent and action is to provide "advice of (a) competent person, (b) disconnected from the grantee and (c) devoted wholly to the grantor/testator's interests." Id. at 622. In the present case, Dean drove Kavanaugh to the bank on each occasion, and she was present while each transaction was consummated. No one else was present other than a bank officer. "The participation of the beneficiary/grantee, or someone closely related to the beneficiary, arouses suspicious circumstances that negate independent action." Harris v. Sellers, 446 So.2d 1012, 1015 (Miss.1984). Prior to the transactions, Kavanaugh did not discuss with anybody his plans to open joint checking accounts with Dean.
¶ 47. In the fall of 2000, Dean convinced Kavanaugh to divide his real property, with Dean receiving twenty-five percent of the property and Kavanaugh's sons receiving the other seventy-five percent equally. While no one contests the validity of the transaction, the chancellor found that Dean's ability to convince Kavanaugh to transfer the real property was evidence of the influence Dean exerted over Kavanaugh. *538 Although Dean claims that she asked Kavanaugh to transfer the land to make sure his sons would inherit a portion of the property, Kavanaugh's sons would have received a greater portion of the property if Dean had not convinced Kavanaugh to make the inter vivos transfer.[1]
¶ 48. Dean argues that Dr. Habeeb's notes that Kavanaugh was a "strong, stoic, great communicator" who was "an independent decision-maker up until the very end" proves that Kavanaugh made his own decisions. The chancellor recognized this testimony. However, the chancellor discounted this testimony because of Kavanaugh's physical weakness and diagnosis as a terminally ill patient. The chancellor was within her discretion to do so. In Madden, the supreme court stated that "[t]he chancellor could manifestly consider the emotional drain and the mental strain upon this old couple" in determining whether the appellant exerted undue influence. Madden, 626 So.2d at 623.
¶ 49. Dr. Habeeb's notes indicate that Dean was making medical decisions for Kavanaugh. His September 1, 2000, notes state:
Today I spoke with the patient and his wife[2] who are both here today in the clinic. The patient is aware of his terminal wide-spread metastatic colon cancer. The patient's wife has stated that in the event of a cardiopulmonary arrest, they desire not to have any type of ACLS, that is, no machines and no life support measures. At this time, the patient is labeled as a DO NOT RESUSCITATE status.
¶ 50. During cross-examination, Dr. Habeeb revealed that Kavanaugh had cerebrovascular disease in the summer of 2000. Dr. Habeeb testified that Kavanaugh's ability to reason might be affected by his cerebrovascular disease:
Q: Isn't it true, doctor, that, using my example, if I had that condition [blocked carotid artery] today, that I might today be able to communicate with you well and tomorrow or next week in a different set of circumstances, in a different environment, I might have problems communicating or I might have problems reasoning?
A: It's possible that the  yes, signs or symptoms can come and go. The patient can look good one day and not good the next day. If a small piece of the clot was to break off and go to the brain, that could further injure the brain. I don't think he had any recurrent or relapsing strokes, but things like stress can unmask the symptoms and give you unmasking of an old stroke, whereas relaxation will return the mental status to near normal.
Q: Is it true that a patient with Mr. Kavanaugh's degree of blockage in his cartoid arteries could on certain days given certain environmental factors, have his ability to reason affected by these blockages?
A: Yes, it is possible.
¶ 51. Dean asserts that Kavanaugh was not suffering from the effects of the 1997 carotid blockage in the summer in 2000. However, Dr. Newcomb's notes in January 2000 stated that Kavanaugh had cerebrovascular disease at that time. In addition, in a note dated July 11, 2000, Dr. Habeeb stated that he was attempting to prevent further blockage in Kavanaugh's right carotid by administering blood thinners, but he was forced to stop this treatment because of Kavanaugh's physical weakness. The chancellor could reasonably infer that *539 Kavanaugh was diagnosed with cerebrovascular disease in the summer of 2000 and that his medical condition impaired his ability to make decisions for himself.
¶ 52. The chancellor, considering the medical evidence as a whole, was entitled to conclude that Dean failed to show, by clear and convincing evidence, that Kavanaugh had the capacity for independent consent and action in the final months of his life. Kavanaugh was in a debilitated physical state in the summer of 2000 as a result of his terminal cancer and other ailments.
¶ 53. THE JUDGMENT OF THE CHANCERY COURT OF WARREN COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P. JJ., IRVING, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. SOUTHWICK AND ROBERTS, JJ., NOT PARTICIPATING.
NOTES
[1] Kavanaugh's three sons were his sole heirs at law. In 1979, Kavanaugh prepared a will leaving all of his property to his sons. The will was never probated.
[2] Dr. Habeeb believed Dean and Kavanaugh were married.