943 So.2d 757 (2006)
Kay BROWN, as Conservator of the Estate of Samuel Wilson Brown, Ward, Melvin N. Brown and Jimmy Brown, Appellants,
v.
Charles AINSWORTH, Appellee.
No. 2005-CA-00329-COA.
Court of Appeals of Mississippi.
November 28, 2006.
*759 Stephen L. Beach, Jackson, attorney for appellants.
Richard Redfern, attorney for appellee.
Before KING, C.J., SOUTHWICK and IRVING, JJ.
IRVING, J., for the Court.
¶ 1. Kay Brown, as conservator of Samuel Wilson Brown's (Samuel) estate, Melvin Brown, and Jimmy Brown (the Browns) filed a petition to set aside a deed conveying property from Samuel to Charles Ainsworth, on the grounds of undue influence and incompetency. After hearing all the evidence, the Simpson County Chancery Court found that no undue influence had been exerted and that Samuel was competent when he conveyed the property to Ainsworth. Aggrieved, the Browns appeal and assert the following errors, which we quote verbatim:
1. Did the Chancery Court commit manifest error in finding no suspicious circumstances which would shift the burden of proof regarding undue influence and the validity of the deed of the subject property to Charles Ainsworth?
2. Did the Chancery Court Judge commit manifest error in failing to further examine the restoration of reason and legal competency of Samuel Wilson Brown, Deceased?
3. Did the Chancery Court Judge commit manifest error in failing to find that there was undue influence exerted over Samuel Wilson Brown, deceased, by Charles Ainsworth?
4. Did the Chancery Court Judge commit manifest error in discounting the testimony of expert witnesses over the testimony of a lay person?
¶ 2. Finding no error, we affirm.

FACTS
¶ 3. Samuel owned around 122 acres of real property in Simpson County, upon which he also lived in a house. The property was acquired by him through his father's estate. The evidence is uncontested that Samuel suffered from severe mental and physical problems.[1] As a result, Samuel *760 was placed under a conservatorship that was overseen by various members of his family, most recently his sister, Kay. Samuel was placed under the conservatorship in the 1970s, but the conservatorship was lifted and Samuel was restored to reason by a court order in 1995. The conveyance at issue in this case was made in 1998, and the petition to set aside the conveyance was filed in 2000. Evidence indicates that Samuel suffered from physical problems near in time to the signing of the conveyance. Samuel was placed back under a conservatorship in 1999, after the conveyance of the property but before the petition to set aside the conveyance. Samuel passed away before the matter came to trial and therefore was not questioned as a witness.
¶ 4. Samuel and Ainsworth became friends and would often go to livestock events together. Additionally, evidence indicated that the two men were close and "Samuel Wilson Brown would confide in Charles Ainsworth." With regard to the conveyance in dispute, Ainsworth drove Samuel to Samuel's attorney and paid for the deed that conveyed Samuel's property to Ainsworth. However, evidence indicated that Ainsworth did not drive Samuel to his doctor's appointments, and Samuel was, at times, able to care for himself and manage his own affairs. Testimony by Tommy Welch, a former county official who knew Samuel, indicated that Samuel had told Welch that he wanted to transfer the subject property to Ainsworth. Welch also testified that Samuel even described how he was going to set about conveying the property. Also notable, as pointed out by the court below, Samuel conducted business, handled money, and signed conveyances both before and after the 1998 conveyance with no complaint from his family and no claim that he was incompetent to conduct his own business.

DISCUSSION AND ANALYSIS OF THE ISSUES
Standard of Review
¶ 5. We will not disturb a chancellor's fact findings on appeal unless those findings are "manifestly wrong, clearly erroneous, or not supported by substantial credible evidence." City of Picayune v. S. Reg'l Corp., 916 So.2d 510, 518(¶ 22) (Miss. 2005) (citing Brown v. Miss. Dep't of Human Servs., 806 So.2d 1004, 1005(¶ 4) (Miss.2000)). If substantial evidence supports the chancellor's findings, we will not reverse, even though "we might have found otherwise as an original matter." Id. at 518-19(¶ 22) (citing In re Guardianship of Savell, 876 So.2d 308, 312(¶ 4) (Miss.2004)). "While we give deference to a chancellor's determination of fact, we review the chancellor's determinations of law de novo." Id. at 519(¶ 23).
1. Burden of Proof
¶ 6. In this claim of error, the Browns claim that they proved that there was a confidential relationship between Samuel and Ainsworth, such that the burden of proof to show that there was no undue influence exercised in the conveyance *761 shifted to Ainsworth. Only upon a finding that there was a confidential relationship would the burden shift to Ainsworth to show that there was no fraud or undue influence exercised in the course of the conveyance. Greenlee v. Mitchell, 607 So.2d 97, 105 (Miss.1992) (citing Miner v. Bertasi, 530 So.2d 168, 171 (Miss.1988)). "Without the existence of a confidential relationship, undue influence must be proved from the evidence without the benefit of any presumption." Id.
¶ 7. A confidential relationship arises where "a dominant, over-mastering influence controls over a dependent person or trust, justifiably reposed." Wright v. Roberts, 797 So.2d 992, 998(¶ 17) (Miss. 2001) (citing Murray v. Laird, 446 So.2d 575, 578 (Miss.1984)). There are several factors that a court looks at when determining whether a confidential relationship is present:
(1) whether one person has to be taken care of by others,
(2) whether one person maintains a close relationship with another,
(3) whether one person is provided transportation and has [his] medical care provided for by another,
(4) whether one person maintains joint accounts with another,
(5) whether one is physically or mentally weak,
(6) whether one is of advanced age or poor health, and
(7) whether there exists a power of attorney between the one and another.
Id. at 998(¶ 18) (quoting In re Estate of Dabney, 740 So.2d 915, 919(¶ 12) (Miss. 1999)).
¶ 8. The court in this case specifically addressed the confidential relationship factors. The court specifically found that Ainsworth did not provide care for Samuel. The court found that Ainsworth sometimes drove Samuel around, but that Samuel also "drove his own vehicle." The court did not specifically address the issue of joint accounts or power of attorney, but we note that no evidence at trial indicates that Ainsworth and Samuel had joint accounts or that Ainsworth had power of attorney. The court did find that Ainsworth and Samuel had a close, personal relationship and that Samuel confided in Ainsworth as a friend. The court also noted that Samuel had both mental and physical problems that were often severe, even requiring hospitalization around the time of the execution of the deed.
¶ 9. We find that the court did not err in finding that the Browns failed to prove that there was a confidential relationship between Samuel and Ainsworth. Ainsworth did not provide medical care or other significant care for Samuel, he did not share joint accounts with him, and he did not enjoy power of attorney. While Samuel had mental and physical problems, the evidence presented did not indicate that those problems prevented him from making his own decisions or running his own life to the point where it would be easy for another person to exert control over his decisions. Furthermore, while Samuel and Ainsworth enjoyed a close friendship, none of the evidence presented about that relationship indicated that Ainsworth controlled Samuel in any way. Therefore, the court did not err in finding that there was no confidential relationship between Ainsworth and Samuel. Since there was no confidential relationship, the burden of proof remained with the Browns to show that undue influence was exerted over Samuel in the execution of the deed to Ainsworth.
2. Competency Proceeding
¶ 10. In this suggestion of error, the Browns claim that the circuit court should *762 have addressed the validity of the 1995 competency proceeding, which restored Samuel to reason. However, as correctly pointed out by the court below, this was not an action to challenge the 1995 competency proceeding. Although the 1995 restoration of reason does bear slightly on the issue of Samuel's competency at the time of the deed, the crucial question is still whether Samuel was competent when he executed the deed in question on April 3, 1998.
¶ 11. As to the competency proceeding, if the Browns wish to challenge the validity of the proceeding, that challenge would have to have been made in a separate action from this one.
3. Undue Influence
¶ 12. The Browns contend that, even if they failed to show that there was a confidential relationship between Samuel and Ainsworth, the chancellor still erred in finding that Ainsworth did not exercise undue influence over Samuel in the execution of the deed.
¶ 13. "In order to set aside a deed on grounds of undue influence, evidence must show that the will and free agency of the grantor were destroyed and the deed actually reflects the will of the person exerting the influence." Greenlee, 607 So.2d at 105 (citing Costello v. Hall, 506 So.2d 293, 298 (Miss.1987)). In Greenlee, the only evidence that existed regarding the free agency of the grantor was the testimony of the grantor's son, the beneficiary of the deed. Id. No evidence indicated that the deed was the intent of the grantor; in fact, the son asked his parents to deed him the property, drafted the deed, and obtained signatures for the deed. Id. Under these circumstances, the Mississippi Supreme Court affirmed the chancellor's determination that undue influence was exercised in the course of the deed's execution.
¶ 14. The facts are notably different in the present case. Welch testified that Samuel had told him that he wanted to leave his property to Ainsworth. No evidence presented in this case indicates that Samuel's "will and free agency" were destroyed by Ainsworth. Therefore, the court did not err in declining to set the deed aside on the ground of undue influence.
4. Competency and Expert Witnesses
¶ 15. On this allegation of error, the Browns contend that the court erred in declining to rule on the basis of their expert witness, Dr. Wood Hyatt.[2] We note at the outset that the court clearly considered the testimony of the Browns' expert witnesses: "this Court has considered all the evidence. . . . I've also heard testimony from local friends, neighbors and acquaintances and expert witnesses. And this Court has considered and studied the demeanor, voracity [sic], competence and credibility of all those witnesses." (emphasis added).
¶ 16. Although many of these facts have already been disclosed, we have created a chronology of the relevant events in this case, which will be helpful to an understanding of this issue:
06/20/1961: Samuel's father executes a will leaving Samuel all of his property, without reservations or restrictions. *763 Samuel's mother is given a life estate to all of Samuel's father's property.[3]
1961: Although there are apparently no records of it, Kay Brown testified that Samuel was admitted to Whitfield for the first time in 1961.
07/02/1965: Samuel is admitted to Whitfield and is diagnosed as having schizophrenic reactions/schizoaffective type.
1971: Samuel's father passes away.
04/03/1975: Samuel is again diagnosed as a schizophrenic/schizoaffective type and is prescribed some form of medication that is given to him by injection.
05/14/1975: Samuel is again admitted to Whitfield, and his doctor notes four prior visits to Whitfield.
07/25/1977: John Brown, Samuel's brother is appointed as conservator over Samuel.
05/05/1978: John Brown resigns as conservator and Melvin Brown, another brother, is appointed as his successor. Melvin is appointed despite the fact that he can neither read nor write.
06/12/1978: Samuel is admitted again to the mental hospital at Whitfield. His chart apparently notes that this was his sixth admission to Whitfield.
1980: Samuel's mother, with whom he was living at the time, passes away.
05/12/1980: Another admission to Whitfield, with a note that Samuel had been admitted many times previously due to his schizophrenia.
08/24/1987: Samuel is released after a roughly two-month stay at Whitfield, diagnosis is schizophrenia.
09/03/1993: Samuel has an annual exam that notes that his blood pressure is elevated.
11/11/1994: Samuel signs a deed selling the timber on his land. He gets $70,000 in return.
11/15/1994: Samuel allegedly uses his proceeds from the sale of his timber to purchase land for his nephew, David Brown (Melvin's son). Samuel purchases the land for David because he believes that David will put a chicken farm on the land and Samuel wants to help David.
05/19/1995: Dr. Sherry Meadows finds that Samuel is "capable of managing his personal business matters. He was totally lucid in our conversation and fully cognizant of all details of our conversation."
08/15/1995: David Brown sells the property that Samuel gave him.
11/06/1995: Samuel is restored to reason and the conservatorship is dissolved. The dissolution of the conservatorship is backdated to 11/10/1994. The timber company notes in its filings that Melvin Brown has never filed an accounting as conservator of Samuel.
04/03/1998: Samuel executes the deed transferring his property to Ainsworth.
05/19/1998: Samuel is admitted to the hospital for extremely high blood *764 pressure and is diagnosed with diabetes.
09/1999/10/27/1999: Samuel goes to Seattle to visit a brother who is dying. The next day family friends inform the family that Samuel is "acting crazy." Samuel is ultimately admitted to Whitfield on 10/27/1999, under the care of Dr. Paul Jackson. He is discharged several months later. Dr. Jackson testified that he believed that some of Samuel's 1999 problems had a "recent" onset. On cross-examination, Dr. Jackson clarified that recent would probably mean less than a year.
12/17/1999: Kay Brown is appointed as Samuel's conservator. Samuel is still in Whitfield at the time of the appointment.
03/17/2000: Samuel is released from Dr. Jackson's care at Whitfield into the care of his family.
06/08/2000: Melvin deeds a piece of property to Samuel. At trial, Melvin claimed that he deeded the property to Samuel because the property was given to Melvin as payment for trees that were cut off of Samuel's property.
07/23/2002: Samuel passes away.
¶ 17. The same level of competency is required to execute a deed as is required to execute a will. Whitworth v. Kines, 604 So.2d 225, 228 (Miss.1992). Even if an individual has suffered from a severe mental defect, "[t]emporary or intermittent insanity or mental incapacity does not raise a presumption that such disability continued to the date of execution." Id. (quoting Young v. Martin, 239 Miss. 861, 871, 125 So.2d 734, 738 (1961)). A grantor who has executed a facially valid deed, such as the one presently at issue, is presumed to be competent, and the party challenging the validity of a deed bears the burden of showing, by clear and convincing evidence, that the grantor lacked the capacity to execute the deed. Id.; Mullins v. Ratcliff, 515 So.2d 1183, 1190 (Miss.1987); Richardson v. Langley, 426 So.2d 780, 784 (Miss.1983). The Whitworth court specifically noted that "mental incapacity or insanity, `is not always permanent, and a person may have lucid moments or intervals when that person possesses necessary capacity to convey property.'" Whitworth, 604 So.2d at 229 (quoting Smith v. Smith, 574 So.2d 644, 653 (Miss.1990)). However, where an individual has been shown to be permanently insane, significant evidence is required to show that the individual was lucid and competent at the time of the execution of the deed. Williams v. Wilson, 335 So.2d 110, 113 (Miss.1976).
¶ 18. Although it is clear that Samuel had suffered from mental health problems, he was not operating under the restrictions of a conservatorship at the time of the 1998 deed and he had been restored to reason several years earlier. Therefore, we cannot say that the lower court was clearly erroneous in finding that Samuel was not permanently insane. Although great efforts were made by the Browns to attack the validity of the 1995 proceeding that restored Samuel to reason, we have already discussed the court's refusal to overrule the restoration proceeding. We further note that, although he claims he was coerced into doing so, Melvin did, as Samuel's conservator at the time, sign off on the restoration to reason. It would be impossible for the court to both refuse to readjudicate or overturn Samuel's restoration to capacity and for the court to find Samuel permanently insane such that the burden of proof shifted to Ainsworth to show that Samuel was lucid at the time the will was signed. Therefore, the presumption of sanity remained intact at the time of the 1998 deed, and the Browns bear the burden of proving *765 that Samuel was not competent to execute the deed to Ainsworth.
¶ 19. The critical time period that we must look at is the time of the execution of the deed. Mullins, 515 So.2d at 1190. Notably, there is no medical evidence to indicate that Samuel suffered from any debilitating mental problems between 1987 and 1999. Although Samuel had been admitted for mental treatment to Whitfield around a dozen times between 1965 and 1987, there is no further indication in his medical records that he suffered any significant mental problems after 1987, at least until his apparent psychotic episode in 1999.[4] The twelve years from 1987 to 1999 are silent as to Samuel's mental condition. However, we note that the evidence at trial clearly showed that Samuel had visited doctors for other purposes during those years, such as for his blood pressure and his diabetes. The lack of Whitfield admissions during those years indicates that the other doctors that Samuel saw found nothing wrong with his mental state, or at least did not believe that he needed immediate psychological care. In other words, for over ten years before the execution of the deed to Ainsworth, Samuel suffered from no mental problems severe enough to require commitment to Whitfield. Additionally, we note that no effort appears to have been made after the dissolution of the conservatorship in 1995 to reinstate the conservatorship. During these years, Samuel apparently bought and sold livestock, and purchased property for his nephew  a transaction whose validity has not been challenged by the Browns to date. In fact, Samuel apparently undertook several transactions on his own. When questioned as to why those transactions had not been contested, Kay Brown testified, "I didn't always like what he did, but when it comes down to an outsider coming in and taking property that my father worked for that is basically the family that should inherit it, yes, I had a problem with that." In other words, Samuel appeared to be competent, in the eyes of his family, to make transactions as long as those transactions were not unfavorable toward the Brown family.
¶ 20. The only evidence indicating that Samuel suffered from severe mental problems at the time of the 1998 deed is in the form of lay testimony by the Browns and other family friends. These witnesses testified that Samuel lived in a state of filth, with trash piled up in his house, and animals roaming unchecked throughout the home. The witnesses testified that Samuel did not have running water or heat, and would burn milk cartons during the winter to keep warm. Although not normal, this testimony is not sufficient to show that Samuel was incompetent at the time he executed the deed. An individual may live in a state of extreme filth and still retain the requisite competency to execute a deed. Therefore, the court did not clearly err in finding that this lay witness testimony did not constitute the required clear and convincing evidence to show that Samuel was incompetent.
¶ 21. Dr. Hyatt testified that, in his opinion, Samuel was incompetent to execute the 1998 deed. However, Dr. Hyatt *766 did not know Samuel in 1998, and only met him after being hired to help the Browns prepare for their lawsuit against Ainsworth. Dr. Hyatt came to his opinions after studying all of Samuel's medical records and speaking to Samuel and other family members. Although the court was required to take Dr. Hyatt's testimony under consideration, we do not find that Dr. Hyatt's testimony was such that the court was required to agree with his assessment that Samuel was incompetent in April of 1998.
¶ 22. Dr. Hyatt was not a treating physician brought in to help Samuel. He was a doctor employed solely for the purpose of helping the family win their lawsuit against Ainsworth. In other words, Dr. Hyatt is far from being a disinterested party. Second, although Dr. Hyatt opined that Samuel was incompetent, the testimony was amply clear that Dr. Hyatt did not know Samuel or Samuel's mental state on the date of the deed. Instead, Dr. Hyatt's opinion appeared to be based, in large part, on two facts: first, Dr. Hyatt believed that Samuel should not have been restored to reason in 1995; second, Dr. Hyatt apparently put great weight on the fact that Samuel did not discuss the deed with the Browns before deeding his property to Ainsworth. However, this Court knows of no requirement that an individual discuss a decision regarding his own property with his family before disposing of that property. Dr. Hyatt admitted that Samuel had the ability to make simple contracts, such as sales of cattle. Dr. Hyatt simply believed that Samuel could not make more complex contracts such as the deeding of property. However, it is not clear to this Court, and may not have been clear to the lower court, why the sale of cattle is any less complex than a simple gift of property to a friend.
¶ 23. As to the medical basis for Dr. Hyatt's opinion, Dr. Hyatt appeared to rely almost entirely on Samuel's diagnosis and his history, while apparently ignoring the fact that there was no evidence of any mental problems between 1987 and 1999. We note again that Dr. Hyatt admitted that Samuel's 1999 breakdown could have been caused by Samuel's visit to his dying brother. We also find it particularly telling that Dr. Jackson, Samuel's actual treating physician, was unwilling to say that Samuel would have been incompetent to sign a deed on April 3, 1998. Dr. Jackson, who had not been hired by the Browns solely as an expert, admitted that he only knew Samuel after the 1998 deed was executed, and, therefore, could not make any determination as to Samuel's competency at the time of the execution. Dr. Hyatt indicated that Dr. Jackson had done some sort of test that was intended to determine Samuel's mental state for the year prior to Dr. Jackson's treatment of Samuel. Even accepting that test's findings as accurate, the results of the test would only be relevant as far back as October 1998, six months after the deed was executed.
¶ 24. The court made it clear in its bench opinion that it was considering the doctor's testimony. The question of Dr. Hyatt's credibility is a determination properly left with the trial court, which was not required to accept Dr. Hyatt's testimony, especially when that testimony was called into question repeatedly during cross-examination. See Owen v. Owen, 928 So.2d 156, 168(¶ 35) (Miss.2006). Therefore, regardless of the fact that this Court might have ruled differently, the lower court was not clearly erroneous in finding that Dr. Hyatt's testimony did not overcome the presumption of competency. The Browns argue that the chancellor was required to make a detailed finding on the record as to his view of each witness's credibility. As *767 support, the Browns cite Fortenberry v. Parker, 754 So.2d 561, 564(¶ 14) (Miss.Ct. App.2000) (citations omitted), where we stated that "[i]t is well-settled that `where conflicting testimony is presented, expert and otherwise, the chancellor is required to make a judgment on the credibility of the witnesses in order to resolve the questions before the court.'" We see nothing in our language that indicates a requirement that a chancellor must make a detailed finding as to his feelings about the credibility of various witnesses. Instead, as our language clearly indicates, a chancellor must make a determination as to which witnesses are most credible when conflicting testimony has been presented. The chancellor in this case clearly made such a determination after examining the testimony of both Dr. Jackson and Dr. Hyatt.
¶ 25. In this case, no testimony was offered to indicate Brown's actual mental state on the date of the execution of the deed, April 3, 1998. With the exception of Ainsworth, no witness could recall with any detail Samuel's mental state on the day in question. However, the attorney who drafted the deed testified that, although he did not specifically recall how Samuel acted or looked, he did not remember him appearing incapable. The lawyer's secretary, who also saw Samuel that day, testified similarly.
¶ 26. The Mississippi Supreme Court has indicated that there are certain situations in which a transfer of property by one with a "[w]eakness of intellect" should be treated with heightened scrutiny, such as when a confidential relationship exists or when property is given for "grossly inadequate consideration." Mullins, 515 So.2d at 1190 (citations omitted). At best, the evidence in this case indicates that Samuel may have suffered from a "weakness of intellect" at the time of the deed. Although the testimony here made it clear that Ainsworth did not give Samuel anything for the transferred land, Welch's testimony indicated that Samuel had told Welch that Samuel wanted to give the property to Ainsworth as a gift. The Mullins court specifically noted that "inter vivos deeds of gift are a perfectly respectable mode of conveyance." Id. (citing Ross v. Brasell, 511 So.2d 492, 496 (Miss.1987); Anderson v. Burt, 507 So.2d 32, 36 (Miss. 1987)). As stated by the Mississippi Supreme Court, "A man of sound mind may execute a will or a deed from any sort of motive satisfactory to him, whether that motive be love, affection, gratitude, partiality, prejudice, or even a whim or caprice." Burnett v. Smith, 93 Miss. 566, 572, 47 So. 117, 118 (1908).
¶ 27. In Mullins, a grantor who did not begin school until he was twelve years old and did not attend past the fourth or fifth grade was deemed competent to deed property to a couple who had helped take care of him. Id. at 1190-91. As in our case, the grantor was given the land in question by his parents, who conveyed it to the grantor "without reservation or restriction, 'clearly indicating their confidence in [the grantor] and his ability to handle his own affairs at that time.'" Id. at 1189. Although Samuel's family protested very strongly that he was completely incompetent to care for himself, we note that his parents also conveyed the family home to him, "without reservation or restriction." Although Samuel's first commitment to Whitfield may have taken place after the drafting of his father's will, the will was executed in 1971, several years after Samuel's first admission to Whitfield. The family appears to have felt confident that Samuel was competent to manage the property until at least 1977, when the first conservatorship was put in place. We also note that, although Samuel was under Melvin Brown's technical care from 1978 until 1994, nothing indicates that the conservatorship *768 was active during those years. Instead, it appears that Samuel largely cared for himself during those years, with little to no intervention from his family.
¶ 28. In this situation, the burden is on the party attacking the validity of a deed to show that the grantor was not competent to make the deed. In the absence of such proof by the Browns, the presumption of competency that Samuel enjoyed supports the lower court's finding that Samuel was competent to execute the deed to Ainsworth. The court was not clearly erroneous or manifestly wrong for finding that Samuel was competent to execute the deed.
¶ 29. THE JUDGMENT OF THE CHANCERY COURT OF SIMPSON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
LEE, MYERS, P.JJ., SOUTHWICK, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR. KING, C.J., CONCURS IN RESULT ONLY.
NOTES
[1] Samuel suffered from diabetes and high blood pressure, and was, in fact, hospitalized as a result of these conditions shortly after the conveyance in question. Samuel also suffered from severe mental problems. Testimony indicated that, at the time of the conveyance, Samuel allowed animals to roam his house, which was filthy. Trash was kept in the house and Samuel burned milk cartons in the fireplace to warm himself. The house had no running water and Samuel suffered from poor physical hygiene as a result. Furthermore, Samuel had been treated for mental illness multiple times since the 1960s, and had been treated as a ward under a conservatorship since the 1970s. Testimony indicated that Samuel would sometimes have outbursts, would talk to himself, would fall asleep abnormally, or would talk erratically. Samuel had been prescribed drugs to help take care of his mental problems, but he did not always take his medicine.
[2] We have used the spelling of Dr. Hyatt's name used in the record. However, we note that a different spelling, "Hiatt" is used in the Browns' brief and in some of the exhibits included as part of the record. For consistency's sake, we spell Dr. Hyatt's name as it is spelled in the trial transcript.
[3] We have summarized Samuel's admissions to Whitfield based on Dr. Hyatt's testimony, as Samuel's medical records were not included as part of the record. However, we note that Dr. Hyatt testified during cross-examination that Samuel was first admitted to Whitfield in 1961, possibly as a result of Samuel's fears about being drafted for the army. However, during his direct testimony, Dr. Hyatt indicated that the first medical record he had from Whitfield was dated 1965. Dr. Paul Jackson also testified that Samuel was first treated for mental illness in 1965. The record, therefore, is not clear as to whether Samuel was first treated in 1961 or 1965.
[4] In 1999, Samuel and Melvin went to Seattle to visit another brother who was dying. A day after returning to Mississippi, Samuel was involved in a car wreck and apparently was in a mental state where he was completely unable to care for himself. Around the same time, he was admitted to Whitfield under the care of Dr. Paul Jackson. Samuel was released again in 2000, but only to the care of his family. Dr. Hyatt specifically admitted during cross-examination that Samuel's 1999 breakdown could have been caused by the visit to Seattle, and that the visit, at the least, almost certainly contributed to Samuel's distressed mental state.