BARNES, J.,
 

 for the Court.
 

 ¶ 1. This is an appeal from the Monroe County Chancery Court’s dismissal of a petition to contest a will and of a complaint for fraudulent conveyances, for removal of the executor, and for appointment of an administrator C.T.A. Finding no error, we affirm.
 

 SUMMARY OF FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. This case involves a dispute between two brothers, John Hawkins and Charles Hawkins, over then’ deceased mother’s last will and testament. The mother, Genevieve Kistler (Kistler), abandoned her husband and sons in 1938. Kistler, along with her second husband, returned to Aberdeen, Mississippi in 1979. John, who lived nearby, began to develop a relationship with his mother. Charles, who had been living in Texas, moved back to Aberdeen in 1985 and also lived near Kistler. Charles started to establish a close relationship with his mother. After Mr. Kistler died in 1995, John’s relationship with his mother began to deteriorate. Although both men lived close to Kistler, she began to depend on Charles and his wife, Florence Hawkins, to assist her with her activities of daily living, such as shopping, paying bills, and transportation.
 

 ¶ 3. Immediately after Mr. Kistler’s death, Florence was placed as joint tenant on Kistler’s checking and savings accounts. In 2001, Kistler executed a power of attorney, naming Florence as her attorney-in-fact. In April 2002, Charles’s and Florence’s names were also placed on Kistler’s $100,000 certificate of deposit as joint tenants, with rights of survivorship. In addition, Kistler removed John’s name from her safety-deposit box access card, without his knowledge, and added Florence’s name.
 

 ¶ 4. Kistler executed a will on April 29, 2002, which left the bulk of her estate to Charles. Kistler had previously executed
 
 *1212
 
 three wills; their dates being September 15, 1981, November 17, 1986, and May 29, 2001.
 
 [1]
 
 All of the previous wills left her estate as follows: one-fourth to John, one-fourth to Charles, one-fourth to Kistler’s daughter, Jean Lembeke (or her children), and one-fourth to the children of Cliff Kist-ler, another son who had predeceased Kistler. These wills were prepared by attorney Mike Jonas. However, the 2002 will was prepared by Julian Fagan, an attorney and part-time preacher at her church. The only other specific bequest in the 2002 will was her savings account, which like the certificate of deposit and checking account, was set up as a joint tenancy with rights of survivorship with Florence. Kistler designated the bequest of her savings account: one-third to John, one-third to Jean’s children, and one-third to Cliffs children. The will also provided that any devisee protesting the will should only receive the sum of one dollar.
 
 [2]
 

 ¶ 5. Kistler died on January 31, 2004. Charles probated the April 29, 2002, will on February 23, 2004, and was appointed executor. John filed a petition for contest of the will claiming that the will was void based upon undue influence by Charles and Florence. The trial court entered an order on September 16, 2005, requiring Charles to respond to John’s discovery request within ten days; Charles complied with the order. On October 21, 2005, however, John filed a motion to compel a response to the requests for production of documents, alleging that Charles had failed to organize or label any discovery, in violation of Rule 34 of the Mississippi Rules of Civil Procedure. On November 2, 2005, three days prior to trial, Charles delivered his discovery responses, revealing that Kistler had established co-ownership of the $100,000 certificate of deposit with Charles. Due to this new information, John filed a motion for continuance and a motion for leave to amend his petition to include a complaint to set aside fraudulent conveyances and to add an additional party. The chancellor granted the continuance and set a new trial date for February 24, 2006. The chancellor also ordered Charles to pay court costs and John’s attorney’s fees. On December 12, 2005, the chancellor granted John’s motion for leave to amend the petition to include a complaint to set aside fraudulent conveyances and to add an additional party.
 

 ¶ 6. On December 16, 2005, Charles and his wife, Florence, were deposed; in their depositions they revealed that their names had been placed on Kistler’s checking and savings accounts. They further revealed that Kistler had transferred other cash funds, as well as an automobile, to Charles.
 
 [3]
 

 ¶ 7. On January 16, 2006, John filed a “Complaint to Set Aside Fraudulent Conveyances, For Accounting, For Removal of Executor and Appointment of Administrator Cum Testamento Annexo De Bonis Non (C.T.A.).” Charles, Florence, and their daughter, Rose Mary Goff, were named as defendants.
 

 ¶ 8. On February 6-7, 2007, a trial was held, and the chancellor found the April 29, 2002, will to be valid. On February 21, 2007, the chancellor dismissed John’s petition for contest of the will and his com
 
 *1213
 
 plaint for fraudulent conveyances, for removal of the executor and for appointment of an administrator C.T.A. On March 2, 2007, John filed a motion for reconsideration or, in the alternative, for a new trial. At the hearing on the motion held on June 5, 2007, the chancellor overruled John’s motion, and the chancellor’s order was entered on June 19, 2007. John filed a timely notice of appeal.
 

 STANDARD OF REVIEW AND INTRODUCTION
 

 ¶ 9. A chancellor’s findings of fact will not be disturbed “on appeal unless those findings are ‘manifestly wrong, clearly erroneous, or not supported by substantial credible evidence.’ ”
 
 Brown v. Ainsworth,
 
 943 So.2d 757, 760(¶ 5) (Miss.Ct.App.2006) (citations omitted). “While we give deference to a chancellor’s determination of fact, we review the chancellor’s determinations of law de novo.”
 
 Id.
 
 (quoting
 
 City of Picayune v. S. Reg’l Corp.,
 
 916 So.2d 510, 519(¶ 23) (Miss.2005)).
 

 ¶ 10. A contestant of a will bears the burden of “proving the existence of a confidential relationship.”
 
 Dean v. Kavanaugh,
 
 920 So.2d 528, 533(¶ 21) (Miss.Ct.App.2006) (citation omitted). A court’s determination of whether a confidential relationship exists depends on consideration of the following factors:
 

 (1) whether one person has to be taken care of by another; (2) whether one person maintains a close relationship ■with another; (3) whether one person is provided transportation and has their medical care provided for by another; (4) whether one person maintains a joint account with another; (5) whether one is physically or mentally weak; (6) whether one is of advanced age or poor health; and (7) whether there exists a power of attorney between the one and [ ] another.
 

 Id.
 
 In the present case, the chancellor found sufficient factors were present to establish that a confidential fiduciary relationship existed between Charles and Kist-ler. Neither party challenges this finding on appeal.
 

 ¶ 11. The mere existence of a confidential relationship between a testator and a beneficiary under the will does not automatically raise a presumption that the beneficiary exercised undue influence over the testator.
 
 Croft v. Alder,
 
 237 Miss. 713, 723, 115 So.2d 683, 686 (1959).
 
 [4]
 
 “[T]he existence of a confidential or fiduciary relationship, coupled with a showing of ‘suspicious circumstances’
 
 such as
 
 the fact that a beneficiary or person who benefits by the will took part in the execution or preparation of the will, gives rise to a presumption of undue influence.”
 
 In re Will of Carter v. Moody,
 
 948 So.2d 455, 458(¶ 10) (Miss.Ct.App.2007) (quoting
 
 Estate of Lawler v. Weston,
 
 451 So.2d 739, 741 (Miss.1984)) (emphasis added). In
 
 Croft,
 
 the supreme court explained that:
 

 [S]uch consequence follows where the beneficiary “has been actively concerned in some way with the preparation or execution of the will,
 
 or where the relationship is coupled with some suspicious circumstances, such as
 
 mental infirmity of the testator;”
 
 or
 
 where the beneficiary in the confidential relationship] was active directly in preparing the will or procuring its execution, and obtained under it a substantial benefit.
 

 Croft,
 
 237 Miss. at 723-24, 115 So.2d at 686 (citation omitted) (emphasis added). “In
 
 *1214
 
 other words, there must be some showing that the beneficiary abused the relationship either by asserting dominance over the testator or by substituting [his] intent for that of the testator.”
 
 In re Estate of Sandlin v. Sandlin,
 
 790 So.2d 850, 854(¶ 9) (Miss.Ct.App.2001) (citations omitted).
 

 ¶ 12. In
 
 Murray v. Laird,
 
 446 So.2d 575, 578 (Miss.1984), the supreme court stated that:
 

 [W]hen the circumstances give rise to a presumption of undue influence, then the burden of going forward with the proof shifts to the grantee/beneficiary to prove by clear and convincing evidence of (1) [g]ood faith on the part of the grantee/beneficiary; (2) [gjrantor’s full knowledge and deliberation of his actions and their consequences; and (3) [а]dviee of (a) competent person, (b) disconnected from the grantee and (c) devoted wholly to the grantor/testator’s interest.
 

 This third factor in
 
 Murray
 
 has been redefined to mean “that the grantee/beneficiary prove by clear and convincing evidence that the grantor/testator exhibited independent consent and action.”
 
 In re Estate of Holmes v. Holmes-Price,
 
 961 So.2d 674, 680(¶ 18) (Miss.2007) (citing
 
 Mullins v. Ratcliff,
 
 515 So.2d 1183, 1193 (Miss.1987)).
 

 ¶ 13. At trial, the chancellor’s findings were vague as to whether John was able to establish the second prong that would give rise to a presumption of undue influence. However, as neither party specifically addressed this particular issue in his closing argument, we find it understandable why the chancellor’s ruling focused more on the third prong of the test. However, counsel for John did concentrate the majority of his motion for reconsideration on the issue of whether the presumption for undue influence was raised. He stated that: “And it was, as I understood your Honor’s ruling, it was the second prong of this two-part test that your Hon- or ruled that — that the contestant, my client, had not met.” While the chancellor still did not clarify whether he had found no presumption of undue influence or whether such presumption was rebutted, he did find “undue influence in the will was not there.” In instances where a chancellor makes no specific findings on a fact issue, “we are required by our prior decisions and by sound institutional considerations to assume that the chancellor resolved all such fact issues in favor of ap-pellee.”
 
 Wilburn v. Wilburn,
 
 991 So.2d 1185, 1193(¶ 19) (Miss.2008). “Where the record contains substantial credible evidence to support the chancellor’s findings, we will defer to them.”
 
 In re Estate of Volmer v. Volmer,
 
 832 So.2d 615, 622(¶ 21) (Miss.Ct.App.2002) (citing
 
 Suess v. Suess,
 
 718 So.2d 1126, 1130(¶ 15) (Miss.Ct.App.1998)). As discussed below, we find sufficient evidence to support either a finding of no presumption of undue influence or that the presumption was rebutted by clear and convincing evidence and, therefore, affirm the chancellor’s decision.
 

 I. Whether the chancellor erred in determining that John failed to establish any “suspicious circumstances” sufficient to create a presumption of undue influence.
 

 ¶ 14. John claims that the chancellor ruled that a finding of undue influence under Mississippi law required: (1) Charles to have occupied a confidential relationship with Kistler, and (2) Charles to have been actively concerned in some way with the preparation or execution of Kistler’s will. John argues that the applicable law, as it pertains to a finding of undue influence, is broader than this interpretation and claims that a finding of “suspicious circumstances” should not be limited only to the preparation and execution of
 
 *1215
 
 the will, but to events that occurred antecedent to the will.
 

 ¶ 15. We observe that the chancellor cited the language in
 
 Croft,
 
 stating that:
 

 In the case of
 
 Croft v. Alder ...
 
 the Court has said this, that inter vivos gifts such as deeds may be deemed presumably void merely by a finding of the Court that a confidential relationship existed between the donor and the donee. It said that the burden then shifts to the donee to rebut the presumption by clear and convincing evidence.... In the context of bequest by the will there is additional requirement that the beneficiary in the confidentiality [sic] relation has been [actively] concerned in someway with the preparation or execution of the will. That is the existence of a confidential relationship or fiduciary relationship coupled with a showing of
 
 suspicious circumstances, such as
 
 the fact that a beneficiary or person who benefits by the will took part in the execution of or the preparation of the will, it gives the presumption of undue influence.
 

 (Emphasis added). While the chancellor and counsel for both parties, at trial, failed to demonstrate specific findings as to the existence of suspicious circumstances, detailed arguments were presented in the motion for reconsideration as to John’s position regarding the existence of suspicious circumstances, other than the incidents surrounding the execution of the will. Despite such arguments, the chancellor maintained his finding that no undue influence existed. To the extent the chancellor’s ruling is based upon a finding of no “suspicious circumstances,” we affirm.
 

 ¶ 16. As to the issue of participation in the drafting of the will, it was noted at trial that Charles and Florence did take Kistler to Fagan’s law office, although it was unclear who set up the appointment. The fact that they drove Kist-ler to the attorney was not unusual due to the fact that Kistler did not drive, and testimony showed that Charles and Florence drove her everywhere. No evidence was presented that Charles or Florence participated in the drafting of the will. Fagan was not Charles’s or Florence’s attorney; Kistler decided that she wanted to use Fagan after hearing him preach at her church. In addition, Fagan testified that no one else was present in the room when he met with Kistler regarding her 2002 will. Although Florence paid Fagan for the preparation of the will, it was from Kistler’s account, and Kistler was present when she did so. Therefore, we find that the record supports a finding that there was no evidence of participation on the part of Charles and Florence in the execution or preparation of Kistler’s will.
 

 ¶ 17. John argues that participation on the part of a beneficiary in the making and execution of a will is only one factor in determining “suspicious circumstances.”
 
 [5]
 
 He contends that the antecedent changes to Kistler’s finances, along with significant changes to the beneficiaries in the 2002 will, should also be considered and are clear evidence of undue influence. John specifically points to the addition of Florence as a joint tenant on Kistler’s accounts, as well as the transfer of money and assets which have been noted above, all of which were done without John’s knowledge. He also questions why Kistler essentially “disinherited” her grandchildren, whom she had provided for in previous wills.
 

 
 *1216
 
 ¶ 18. John maintains that Charles and Florence isolated Kistler from the rest of the family and that this fact raises a presumption of undue influence. John argues that when he and other family members would call her to go somewhere, she would insist on checking with Charles and Florence first. However, the testimony also showed that John began to be too involved in his own family matters to care consistently for his mother and that his mother felt that their relationship was strained due to her abandonment of John when he was young. The chancellor observed in his findings that he “could tell from the testimony that John still had some animosity toward [Kistler,]” and the chancellor was sure that John’s “animosity came out when he discussed [the abandonment] with his mother a few times.” Fagan specifically noted that Kistler told him that John had not made any effort toward their relationship and that was the reason she was making the changes to her will. Charles and Florence took care of Kistler for approximately nineteen years, providing her with assistance and guidance in daily matters. They devoted a tremendous amount of time and effort to their relationship with Kistler, and according to Fagan’s testimony, Kistler was merely attempting to give them the benefit of that devotion. Kistler clearly felt more comfortable letting Charles and Florence be her main source of family support, and the will reflected her gratitude.
 

 ¶ 19. Although changes to a will might be considered unnatural, “this is not the proper basis for a finding of undue influence.”
 
 Smith v. Averill (In re Will of Smith),
 
 722 So.2d 606, 612(¶ 20) (Miss.1998) (citing
 
 Wallace v. Harrison,
 
 218 Miss. 153, 163, 65 So.2d 456, 459 (1953)). Charles’s and Florence’s access to Kistler’s finances were not unusual or suspicious. Kistler was more than seventy years old when Charles moved back to Mississippi, and it is understandable that someone of her advanced age would have someone she trusted to help her pay her expenses of daily living and to have the ability to take care of her in the event that sickness rendered her incapable of taking care of herself.
 

 ¶ 20. Despite the fact that the chancellor’s ruling was imprecise as to whether there was sufficient evidence to shift the burden based on a presumption of undue influence, we conclude, as did counsel for John at the motion for reconsideration hearing, that the chancellor likely found no evidence of suspicious circumstances to raise this presumption. The conclusion that there was no evidence of suspicious circumstances is not manifestly wrong and is supported by substantial credible evidence. This issue is without merit.
 

 II. Based on a finding of “suspicious circumstances,” whether the presumption of undue influence on the part of Charles was overcome by clear and convincing evidence.
 

 ¶ 21. Alternatively, based on a presumptive shifting of the burden of undue influence, John contends that some of the chancellor’s remarks — that it was a “fairly close case” and “I just don’t think the burden of undue influence has been met, I truly don’t.” — indicates that Charles failed to prove a lack of undue influence by clear and convincing evidence. Although John argues that the chancellor failed to establish that Charles had the burden of proving a lack of undue influence by clear and convincing evidence, we disagree. The chancellor noted that:
 

 It was for Charles and them to overcome, the burden is placed upon them. Has that presumption been rebutted by
 
 clear and convincing evidence?
 

 (Emphasis added). Therefore, as the chancellor properly applied the third-
 
 *1217
 
 prong factors under
 
 Murray,
 
 we affirm his findings.
 

 ¶22. The chancellor found that there was “no hard evidence” to suggest that Charles and Florence did not act in good faith. Charles and Florence provided frequent transportation for Kistler and assisted her in paying her bills, which was the reason for their receiving signature authority on Kistler’s accounts. While we acknowledge that Kistler gave Charles financial gifts, there was no evidence presented that either Charles or Florence misused Kistler’s funds in any way; nor do we find testimony which showed any involvement on the part of Charles and Florence that could be perceived as controlling Kistler’s actions. They also testified that they had no specific knowledge of Kistler’s bequests under the will, except to say that Kistler warned Charles after she left Fa-gan’s office that John would probably “make a stink” about the will.
 

 ¶ 23. While John testified that his mother had very little education and “could barely read and write,” Fagan stated that Kistler was aware of what her assets were and appeared to be in complete control of her faculties on the two occasions that she met with him. This Court finds the bequest of the savings account that Kistler held in joint tenancy with Florence, which was to be distributed to the other heirs, to be the most troubling aspect of the will. A will written subsequent to the creation of a joint tenancy, which divests the “funds to some other source[,].... does not destroy the joint tenancy and does not terminate that tenancy and divest the corpus of it into the estate of the testator.”
 
 In re Will and Estate of Strange,
 
 548 So.2d 1323, 1328 (Miss.1989). Kistler may have intended the funds be distributed as provided in her will, but under Mississippi law, Florence became the sole owner of the savings account after Kistler’s death. Fagan stated that he discussed Kistler’s various accounts with her, although he could not state with specificity which accounts they discussed or whether he discussed the issue of joint tenancy with her. However, when asked whether he thought Kistler understood that Florence would have ownership of the savings account, Fagan stated:
 

 I think what — you are asking is in regard to the — the legality of joint ownership, and I have seen it go both ways in the contest of it. But in my discussions with — my concern was that Mrs. Kistler understands what she wanted to do, understands the ramification of it, and make her choice in light of those. And in discussing this issue with her, she did understand about the legal ownership. She also was convinced that the person who was the joint tenant, my recollection was Florence, was a person who would not take that money as her own but would use those funds in accordance with what she had set forth in the will.
 

 ¶ 24. The will directed that any debts, including those related to Kistler’s last illness and burial, along with expenses related to the administration of Kistler’s estate, were to be paid out of the savings account. The savings account in question contained $22,835.53 on December 25, 2003, approximately one month prior to Kistler’s death. Although we cannot be certain whether Kistler completely understood the implication of the joint ownership of the savings account, we find that this question is insufficient to set aside the will based on the specific circumstances of this case. Had the account contained a more substantial portion of the estate, we might have been inclined to find that a more serious consideration of the status of this account should be conducted. We note that the bulk of Kistler’s estate, i.e.,
 
 *1218
 
 the $100,000 certificate of deposit, was distributed inter vivos. However, at the time the will was executed, evidence showed Kistler understood that there was a likelihood there might be no residual funds remaining for those beneficiaries named in relation to the savings account.
 
 [6]
 
 Accordingly, while we agree with the chancellor that there was a question whether Kistler
 
 fully
 
 appreciated the legal status of this account, we find that there was sufficient evidence to support the chancellor’s conclusion that Kistler “knew what she was doing and knew what she wanted to do.”
 

 ¶ 25. Charles also presented ample evidence, including the testimony of two disinterested witnesses, to show that Kistler was increasingly upset over her deteriorating relationship with John.
 
 See Holmes-Pickett,
 
 961 So.2d at 681(¶ 19) (in order to rebut a presumption of undue influence, there must be “other substantial evidence, either from the circumstances, or from a totally disinterested witness from which the court can conclude that the transfer instrument represented the true, untam-pered, genuine interest of the grantor”);
 
 see also In re Estate of Edwards,
 
 520 So.2d 1370, 1373 (Miss.1988) (“the testimony of subscribing witnesses is entitled to greater weight than the testimony of witnesses who were not present at the time of the will’s execution or did not see the testator on the day of the will’s execution”). John’s wife, Alice, even testified that Charles encouraged John to develop a better relationship with his mother, disputing John’s claim that Charles was trying to keep him from spending time with her. In spite of the testimony by John’s children that Kistler needed someone to write checks for her and that she had never managed her finances independently, we find that the evidence showed that Kistler understood what she was signing, and that she had knowledge of her bills or assets. Charles testified that his mother was “sharp,” and Fagan stated that Kistler was aware of her assets and the value of her estate.
 

 ¶ 26. As to the third factor, Kistler received legal guidance from Fagan, the attorney who Kistler specifically requested after she heard him preach in her church. The testimony showed that Fagan was a disinterested party who rendered competent legal advice to Kistler regarding her last will without any influence on the part of Charles or Florence; therefore, we agree with the chancellor’s findings of good faith on the part of the beneficiaries and that Kistler received independent knowledge and counsel from someone who was solely devoted to her interests and not those of the beneficiaries.
 

 ¶ 27. Assuming that there was a presumption of undue influence, we find that Charles met his burden proving no undue influence by clear and convincing evidence and find no merit to this issue.
 

 III. Whether John’s complaint to set aside fraudulent conveyances should be sustained and judgment entered for John or, in the alternative, whether the complaint to set aside fraudulent conveyances should be remanded for a new trial.
 

 ¶ 28. John also claims that the money and automobile conveyances by Kistler to Charles and Florence should be set aside as fraudulent conveyances. However, John does admit in his brief that should this Court find no error in the chancellor’s opinion, this issue is moot as Charles
 
 *1219
 
 would receive the property at issue under the terms of the April 29, 2002, will. We agree, and as we have found no error in the chancellor’s findings regarding the will, we find that this issue is moot.
 

 IV. Whether the chancellor erred in dismissing John’s motion for reconsideration or, in the alternative, for a new trial.
 

 ¶ 29. Again, John claims that Charles’s failure to overcome the burden of undue influence by clear and convincing evidence warrants the remand of this case for a new trial. “A petition for reconsideration is treated as a motion to amend judgment pursuant to M.R.C.P. 59(e).”
 
 Boyles v. Schlumberger Tech. Corp.,
 
 792 So.2d 262, 265(¶ 6) (Miss.2001) (quoting
 
 In re Estate of Stewart,
 
 732 So.2d 255, 257(¶ 8) (Miss.1999)). “[I]n order to succeed on a Rule 59(e) motion, the movant must show: (i) an intervening change in controlling law, (ii) availability of new evidence not previously available, or (iii) need to correct a clear error of law or to prevent manifest injustice.”
 
 Brooks v. Roberts,
 
 882 So.2d 229, 233(¶ 15) (Miss.2004) (citation omitted). This Court reviews the denial of a Rule 59(e) motion for abuse of discretion.
 
 Id.
 

 ¶ 30. As we have already found that Charles overcame any presumption of undue influence by clear and convincing evidence, and as John has failed to demonstrate by way of evidence that the chancellor abused his discretion in dismissing John’s motion for reconsideration or his motion for a new trial, we affirm the chancellor’s dismissal of John’s motion.
 

 ¶ 31. THE JUDGMENT OF THE CHANCERY COURT OF MONROE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR. IRVING, J., CONCURS IN PART AND IN THE RESULT.
 

 [1]
 

 . Kistler also had another will drafted in 1999, but the record does not reflect that she ever executed it.
 

 [2]
 

 . The 1999 draft and May 2001 will also contained this provision.
 

 [3]
 

 . In September 1997, Kistler gave her deceased husband's automobile to Charles, which he sold for $6,000. On March 6, 2001, Kistler transferred $10,000 to Charles’s checking account as a gift to help him buy a new car.
 

 [4]
 

 . This is distinguished from inter vivos gifts where the presumption of undue influence automatically arises based on a finding of a confidential relationship.
 
 Croft,
 
 237 Miss. at 726, 115 So.2d at 687-88.
 

 [5]
 

 . We note that the only "suspicious circumstances” actually referenced in
 
 Croft
 
 — besides circumstances surrounding the preparation and execution of the will — is the "mental infirmity of the testator.” John has made no claim before this Court that Kistler suffered any such infirmity.
 

 [6]
 

 . As of June 26, 2005, Kistler's savings account contained only $7,828.54, which reflected withdrawals for debts as directed by the will (i.e., expenses for administration of the estate including attorneys' fees) and credit for interest earned.